Counsel for the United States will submit an Order in conformity herewith.

**UNITED STATES of America ex rel. Frank COLE, Petitioner,**

**v.**

**H. W. FOLLETTE, Warden of Greenhaven Prison, Stormville, New York, Respondent.**

**No. 69 Civ. 637.**

United States District Court
S. D. New York.

June 17, 1969.

Michael O. Finkelstein, New York City, for petitioner.

Louis J. Lefkowitz, Atty. Gen. of State of New York, New York City, for respondent; Charles A. La Torella, Jr., Asst. Atty. Gen., of counsel.

OPINION

FRANKEL, District Judge.

On November 2, 1956, a Westchester County grand jury indicted petitioner on charges of attempted sodomy, assault and criminal sexual practices upon an eleven-year-old boy. The crimes were alleged to have been committed on September 1, 1956. In November of 1965, nine years after the indictment, petitioner's case came on for trial. During more than seven of those intervening years he had been confined in Matteawan State Hospital, having been found

repeatedly to be incompetent to assist in his own defense. Against that background, and with continuing indications that his mental and emotional state was at best dubious, petitioner was found in November 1965 to be engaged in "dilatory tactics" when he dismissed his retained counsel, and he was put to trial a few days later without new counsel. Forced over his objections to defend himself, but with his dismissed lawyer serving as an advisor, petitioner was found guilty and was sent by the trial judge to Grasslands Psychiatric Clinic for a psychiatric report prior to the court's consideration of sentencing.[1] Thereafter, having received the report and determined that petitioner was a second felony offender, the court sentenced him to a term of from 15 to 20 years.

Following a long course of collateral attacks mounted *pro se*, petitioner came here seeking habeas corpus. His troublesome but only intermittently lucid papers called for the assistance of counsel. Michael O. Finkelstein, Esq., accepted the assignment and has worked indefatigably—organizing the facts hereinafter recounted; withdrawing the initial petition as premature, and exhausting an available plea to the New York Court of Appeals; and then filing the revised petition now before this court. These devoted and imaginative efforts have resulted in demonstrating grounds of constitutional law upon which this court will grant the petition for a writ of habeas corpus.

I.

The case is one in which it is peculiarly useful to have a detailed appreciation of the facts. At least this is the premise thought to justify the rather lengthy recital which follows.

Following his indictment on November 2, petitioner entered a plea of not guilty on November 21, 1956. On January 30, 1957, he withdrew that plea and pleaded guilty to assault in the second degree "to cover all counts" in the indictment. On March 7, 1957, he was allowed to withdraw the guilty plea and again to plead not guilty to all counts. The next day, March 8, he was committed for psychiatric examination, the result of which was a determination that he was insane.

On April 15, 1957, petitioner was committed to Matteawan State Hospital. He remained there until November 17, 1961, when he was certified as sane and returned to the Westchester County Jail. Some seven months later, on June 29, 1962, still awaiting trial, he was released on bail.[2] Bail was revoked on August 29, 1962, upon the district attorney's motion following petitioner's arrest on new charges of sodomy. Once again he was committed for psychiatric observation. On September 25, the medical examiners at Grasslands Hospital found him sane. Two nights later he attempted suicide by hanging himself with a bedsheet in the County Jail. He was recommitted to Grasslands on the following day, and three weeks later, on

---

1. The order for such a report was evidently made under N.Y. Penal Law (of 1909), McKinney's Consol.Laws, c. 40, § 2189–a, which applied at the time of petitioner's conviction. That statute provided:

"No person convicted of a crime punishable in the discretion of the court with imprisonment for an indeterminate term, having a minimum of one day and a maximum of his natural life, shall be sentenced until a psychiatric examination shall have been made of him and a complete written report thereof shall have been submitted to the court. Such examination shall be made in the manner prescribed by sections six hundred fifty-nine, six hundred sixty, six hundred

sixty-one and six hundred sixty-two-e of the code of criminal procedure. Such report shall include all facts and findings necessary to assist the court in imposing sentence. A copy thereof shall be transmitted by the clerk of the court to the warden or superintendent of the correctional institution to which the prisoner is committed."

2. Among the circumstances accounting for the bail order of June 29 was the fact, as respondent reports, that petitioner's delayed trial could not have been held in either July or August, there being no jury term in Westchester County during those months.

October 18, 1962, was found by the psychiatric examiners to be incapable of understanding the proceedings against him or assisting in his own defense. On the prosecutor's motion, that finding was confirmed and petitioner was sent once again to Matteawan.

Early in 1965, petitioner sought release on habeas corpus, claiming he was sane. Over the State's opposition, his petition was granted in May of 1965 and he was remanded to the custody of the Westchester County Sheriff for trial of the 1956 indictment. Some five months after that, on November 1, 1965, his case was called for trial. The events of the ensuing two weeks or so, against the background which has been described, encompass the due process violations requiring that this court grant the writ of habeas corpus.

The proceedings on November 1, 1965, concerned essentially only with the scheduling of the trial's commencement, were brief. At the outset of the short discussion (all of which occupies three pages of typed transcript) the trial judge corrected a suggestion by the assistant district attorney that he (the judge) was in some measure already familiar with the case. He said (Tr. 2):

"Outside of the fact that it has been pending for a long period of time, * * * I don't know anything about it."

Following some other brief exchanges, the case was adjourned to the morning of Wednesday, November 3, at which time, the judge said, jury selection would begin.

When court opened on Wednesday, however, petitioner announced immediately that he had dismissed his retained counsel the night before and that he was "going to bring in Harry Blum of New York City" as substituted counsel. Asked to comment, the prosecutor said petitioner had had six or seven lawyers already; that petitioner himself had been pressing for a speedy trial; and that the People opposed further delay. There was some discussion of a pending proceeding before another judge and

of a letter from petitioner marked "confidential" which had been received by the trial court that morning. Petitioner's "dismissed" counsel (Mr. Spence) asked leave to withdraw. The court stated the case would be put over until the following morning, and no longer, and that petitioner would then be expected to proceed either with Mr. Blum, with the help of Mr. Spence, or alone. "I am satisfied," the trial judge said,

"that the conduct of the defendant is perhaps an effort at delay in the trial of this case. Although I well recognize that a defendant has the right to change attorneys, I may point out for the sake of the record his presence here with a file and a copy of the Penal Law, so he must be well aware of the fact that any case which has been on this calendar this long, and in which he apparently, though I have no way of knowing what the contents of the petition for a writ of habeas corpus, he apparently must be aware of the necessity of a prompt disposition of this case on the merits. I will set it down ten o'clock tomorrow morning and I will expect Mr. Blum to be here at that time prepared to go ahead or make a statement. We have no indication in this court of the retainer other than the statement of the defendant. We do not have Mr. Blum here in the court this morning, so it is apparent from his statement that somewhere between Friday [actually, Monday], when he was last here in the court, and today, he must have contacted Mr. Blum in New York City, who must have known that the case was on the calendar, and we expect courtesy from the attorneys to be here on a calendar call. That is the decision of this court. You will have an opportunity to contact him and we will proceed to trial tomorrow morning." (Tr. 9–10.)

When petitioner then said he had been in touch with Mr. Blum for some time before, but that an actual substitution had not been accomplished, the judge asked for a copy of an alleged letter re-

flecting this. Petitioner, after some rummaging, produced two letters. The judge read them, then said:

"* * * [O]n Monday of this week, November 1st * * * no statement was made to this Court as to the prior contact with another attorney nor was there any indication given to this Court, and I now find that as far back as July, 1965, to be exact, July 24th, he, the defendant was in contact with another attorney, and as late as October 26; I am more than ever convinced that the defendant's tactics are those that are dilatory in nature and that they are designed to prevent this case from going to trial, and that this Court, in view of the length of the indictment in this case, insist that it go to trial and that he, Mr. Blum, appear here tomorrow morning at ten o'clock, as his counsel. I will request Mr. Spence to continue as assigned counsel, over the objections of the defendant, until that time. The case will be here tomorrow morning." (Tr. 13–14.)

On the next morning, Thursday, November 4, the judge opened the following colloquy:

"* * * Yesterday afternoon my chambers received a telephone call from Mr. Blum, that Mr. Blum talked to Mr. Gardella, my secretary, and advised my secretary, and this of course would be hearsay on the Court's part, that he had been retained in this case by Mr. Cole's mother. I advised him that the case was on trial, or through Mr. Gardella, that the case was marked ready for trial this morning. He said that he had an engagement in Queens County. Now I am of course detailing the information which was given to me, and that he had to be in Queens County and would we please

put the case over in Westchester until 2 o'clock in the afternoon. I said to him that the Cole case had been marked ready on this calendar on Monday and it had been so indicated by Mr. Cole's then counsel Mr. Spence and that the case was ready here and we would expect Mr. Blum's appearance to make his application on the record in this Court.

"I was also advised through the medium of Mr. Gardella that the matter appearing in Queens County involved a misdemeanor as contrasted with this case. Mr. Blum is not here at this time, which is ten-thirty in the morning. I will direct the picking of a jury and direct a jury to come down. Mr. Spence, I will ask you if you will stand by to assist the defendant in his own defense, if necessary.

"MR. SPENCE: I have to object to your request, Your Honor.

"THE COURT: You talked to Mr. Blum, too, incidentally?

"MR. SPENCE: Yes, sir, I did.

"THE COURT: He told Mr. Gardella that you talked to him too." (Tr. 17–19.)

The assistant district attorney recalled again that petitioner had had seven lawyers in the nine years since his indictment, mainly involved in habeas proceedings while he was being held as incompetent to stand trial. Then the petitioner, with the species of pseudo-learned bombast familiar to all who have considered matters of this kind, proceeded to argue that he had been denied a speedy trial.[3]

Observing that he had "taken notice" of the argument, the judge reported that he had given instructions to bring in a jury panel. He announced that there would

3. While the rhetoric may not have been professional, the argument in its substance was (and is) by no means frivolous. When petitioner first came to this court, the speedy-trial point was his asserted ground for federal habeas. The point has not been abandoned, but the obtaining of necessary records has delayed its full exploration. The parties have postponed that inquiry by stipulation. In the meantime, however, having determined that the petition must be granted on other grounds, this court has not deemed it proper to postpone decision.

"be no delay in the course of this trial other than that which has been occasioned in the Court's opinion by the dilatory tactic of the defendant in discharging his attorney on the evening of trial and the failure of his new counsel to be present in court. The United States Supreme Court has also held that under certain circumstances a man may be capable of defending himself and I think maybe this is what Mr. Cole wants to do, in view of the ableness of his argument." (Tr. 23–24.)

With petitioner protesting and Mr. Spence ordered to stand by as an advisor, the panel arrived at 11 a. m. for the commencement of jury selection. After a few preliminary steps, which petitioner purported not to comprehend, the judge ordered a recess from 11:09 a. m. until 2 p. m., noting that the County might have been required to pay for the jurors' luncheon had the selection been completed before the time for that meal (Tr. 30). When the jurors had departed, the judge said (Tr. 30–31):

"I would like to have the record reflect that in the conversation yesterday afternoon at my chambers, Mr. Blum indicated that he would be available at two o'clock today. I also want this for the Appellate Division's perusal, as to the conduct of Mr. Cole's attorney to be here at the direction of this Court this morning, and I will hold it until two o'clock this afternoon. In the event of Mr. Blum's failure to appear, under all of the facts and circumstances, I will want this record transcribed and sent to the Appellate Division or to the Grievance Committee for their action in connection with it."

Following their return after lunch, at 2:15 p. m., the prospective jurors were excused again, this time until the following morning. When they had gone, the trial judge placed upon the record an account by himself and his law secretary of the latter's conversations with Mr. Blum and with the judge, and of Mr. Spence's talk with Mr. Blum. Concluding this portion of the record, which is quoted in the margin,[4] the judge ex-

4. "THE COURT: Mr. Gardella, this morning I had occasion to place upon the record certain statements which you relayed to me last evening in chambers, purportedly to be a conversation with a man by the name of Blum, and I wondered if in your presence here, or now that you are here at this time, which is two-twenty in the afternoon, would you please for the sake of the record state what the conversation was with the man by the name of Blum.

"MR. GARDELLA: There are two, Your Honor, two telephone calls.

"THE COURT: Yes.

"MR. GARDELLA: In the first one he indicated that a relative of the defendant Mr. Cole had spoken to him about a possible arrangement by which he would represent Mr. Cole. He also said that he had not been formally retained but he expected that he would be. He also said that he hadn't filed a statement of retainer. He said that he had a prior commitment in Queens, and wondered if the matter couldn't be adjourned until two o'clock. And I told him that I was not in a position to give him that information, that I would talk to the Judge and call him back, which I did do. And in that

conversation told him that the matter was marked for ten o'clock, and there was to be no excuses accepted, and that because of the prior history of this matter, the Judge requested his presence at ten o'clock. He said that he considered that impossible because of his present schedule, and that he might talk to Mr. Spence about appearing for him. I said that the Judge said that he was to be there at ten o'clock, and that was it. But he apparently was going to have Mr. Spence come here and attend for him and he said he would be here no later than two o'clock anyway.

"THE COURT: I would like to correct, then, the statement which I made for the record this morning. It was my understanding that he, Mr. Blum, had been retained. It could be possible in the transition of the message from you, Mr. Gardella, to me in chambers, that I misunderstood that aspect. So this morning I stated that I understood that he had been retained, actually. It appears from your conversation that he said he expected to be retained.

"MR. GARDELLA: He said that the terms offered were, the financial arrangement offered him was acceptable.

pressed doubts about the propriety of Mr. Blum's behavior, and then adjourned until the next day.

On the morning of Friday, November 5, the case was put over again on petitioner's stated understanding, which he

"THE COURT: Did I understand you, too, Mr. Gardella, to say that the relative was the mother of the defendant?

"MR. GARDELLA: I think he did say that; I'm not sure, Judge.

"THE COURT: This was my recollection, that you had told me it was the mother of the defendant. Will the record please reflect that we have not heard from Mr. Blum. Mr. Spence, as an officer of the Court, now, may I ask you, have you heard from Mr. Blum?

"MR. SPENCE: Yes, Your Honor; I spoke to Mr. Blum about 20 minutes to two. He called—no, I called him. I tried to get him right after we left this morning; and I called him at 20 to two. He was not in prior to that. Then he called me, just a couple of minutes later. He must have called his office for his messages from outside and he told me he was still appearing again two o'clock in the Queens Criminal Court.

"THE COURT: Did he tell you whether or not he had been retained by this defendant?

"MR. SPENCE: He said that he had signed no retainer and that as far as he had, at that present time, not received any financial money as yet.

"THE COURT: Would it appear, too, at this stage, that the Court has now called the Queens County Criminal Court, and we are making an effort to locate Mr. Blum; talked to Mrs. Sullivan in the Queens County Court, asked her if she would please make an investigation for us as to his whereabouts.

"THE CLERK: I know now.

"THE COURT: Yes.

"THE CLERK: He is on trial in Part 2 of the Criminal Court in Queens, on a matter of, I guess it's People against Brainen, before Judges Weinfeld, Brennan and Strong, and he won't be able to appear before Monday. I still have—

"THE COURT: I would like to talk to any one of the Judges, or Judge Grote down there in Queens County, because this Court, in the orderly processes of its business, is entitled to have counsel contact this Court on behalf of the defendant. I stated this morning that in over 38 years of practice, I consider this type of practice that should receive at the proper time consideration of the proper authorities, the Bar. The District Attorney has

expressed as the product of what he had heard from the judge and the judge's law secretary, that Mr. Blum would be available to appear for him on the following Monday.[5] The prosecutor urged that there be no more delay, saying he had

been ready, the defendant has been ready; the discharge of counsel and the unavailability of counsel, we all recognize has been a tactic utilized by defendants in a great many cases before. I will talk to Judge Weinfeld. I will remand this defendant to Jail and we will be here tomorrow morning at ten o'clock.

"(Recess at 2:25 p. m.)

— — —

"(November 4, 1965, at 3:25 p. m.)

"(The following transpired in the Court's Chambers, the Clerk of the Court being present:)

"THE CLERK: I was in touch with a Frances Sullivan, who put me in touch with a Court Officer, Mr. Roger Casey, who after discussions with Judge Brennan in Part 2-B of the Criminal Court in Queens, checked the Part and found out that Mr. Blum was not on trial in Part 2-B. He also went and checked Part 2-A and said that Mr. Blum was not on trial in that Part and no one there had heard of him." (Tr. 33–39.)

5. "THE COURT: People are ready, Mr. McGuire?

"MR. McGUIRE: The People are ready.

"THE COURT: Are you prepared, Mr. Cole, to proceed? Mr. Cole, are you prepared to proceed?

"DEFENDANT: I cannot proceed with the attorney you have forced upon me; he's not my attorney. My attorney Blum is in New York City. He has contacted the court and said he would be here.

"THE COURT: When did he contact you, sir?

"DEFENDANT: Contact me?

"THE COURT: Yes.

"DEFENDANT: From the conversation I heard here yesterday, which Your Honor related—

"THE COURT: I asked you, Mr. Cole, when did he contact you?

"DEFENDANT: Last was by letter, but I'm going by what Your Honor said.

"THE COURT: May I ask you, when it was by letter, sir?

"DEFENDANT: Approximately a month ago, and my people have contacted him since, within the last week.

"THE COURT: Do you have, by any possible chance, my remarks should not

and will not be construed in any way adversely to you, do you have a belief that he will be here?

"DEFENDANT: Definitely, sir; definitely.

"THE COURT: And would you give us an indication as to when you believe that he would be here?

"DEFENDANT: From what Your Honor said yesterday, and the Clerk, he will be here Monday.

"THE COURT: All right. In the absence of the Jury, Mr. McGuire, then we will discuss this.

"(The following was addressed to the prospective jurors:)

"THE COURT: I will at this time, Ladies and Gentlemen, and this again I must caution you most strenuously, you should draw no conclusions from the colloquy that takes place here this morning in reference to the attorney whom Mr. Cole has and who had indicated an appearance here. I will, under the circumstances, adjourn this until ten o'clock tomorrow morning. Again, at this time, will you return here to this room. I am trying to prevent you from being shepherded in the hall and milling around out there; if it is possible we will try and dispose of our calendar by that time. You are all excused until Monday morning at ten o'clock.

"(Prospective jurors recess at 10:51 a. m.)

"(The following transpired in the absence of the prospective jurors:)

"THE COURT: I would like to have everyone out of the courtroom for the moment.

"(Whereupon the courtroom was cleared of spectators.)

"THE COURT: Would the record please reflect that the Court has excused the prospective jurors; that yesterday afternoon at the Court's request, a check was made in the light of the statement advanced by Mr. Blum, with the Queens County Criminal Court. It was ascertained through the medium of this Court that the case that Mr. Blum referred to was People against Brainen. This Court talked to Judge Brennan, one of the three justices before whom he, Mr. Blum was supposed to be, and Mr. Bilgre ascertained that that case was adjourned until December 10th, 1965, according to the information which we have received, so that Mr. Blum, for the sake of the record, was not engaged in trial and that it was for the purposes of an adjournment or an adjournment having been granted in this case in the Queens County Criminal Court. Mr. Blum called the Court this morning, talked to Mr. Gardella, and the Court likewise talked to him on the telephone, pointing out that it's a requirement of filing of a retainer, and reviewing the status of this case, Mr. Blum said first he had been retained by the family, that it was not an issue of money, and then said he was not retained in the sense that a formal agreement had been arrived at, and that he found it necessary this morning to appear in a local city court in connection with a man who had been in jail for two months and whose wife had just had a baby and who was held on a gun charge, to see if he could not get him admitted to bail. So that by Mr. Blum's statement, apparently his application was one for bail as contrasted with the fact that it had been communicated to him that a panel of jurors were present and that this case had been held in Westchester County for a period of one week as of today, excluding the holiday, and that he, Mr. Blum, could not get here today but he would be here on Monday morning.

"There has been filed, as far as this Court can ascertain, no record of Mr. Blum's retainer. There is a statement made by the defendant that through sources which are available to him, he understands that his family has engaged Mr. Blum.

"This Court now feels that with a week having gone by and the defendant having been accorded his constitutional right to be represented by counsel, and that he has not, unless this should appear from further explanation upon Monday morning, that he has not availed himself of the opportunity to procure other counsel, except as has been indicated in this record, that at ten o'clock Monday morning, absent Mr. Blum's appearance here, this case will proceed to trial in which the defendant may avail himself of his constitutional privilege of representing himself on the trial. I will at this time relieve Mr. Spence of his assignment, which I asked him to continue when this was presented on Wednesday morning, and will request of him his appearance here on Monday to assist, if it is desired by the defendant, and to be available to the defendant for consultation and conference in connection with the trial of this case.

"I understand that the People have, and it has been protested to this Court, subpoenaed certain witnesses who have been here for a week and I would like to have you, Mr. McGuire, put this on the record, if you will, because after all, the equities in the trial of any criminal case will be balanced between the rights of a defendant

been ready for a week, and adding (Tr. 46):

"I will also advise the Court that I have had witnesses in one instance, a man coming over three thousand miles to attend the trial of this case."

When petitioner sought leave to answer some of the prosecutor's remarks, the judge said (Tr. 47–48):

"I would rather, in the light, Mr. Cole, of the fact that you are represented by counsel, have counsel make such statements on your behalf, rather than you yourself at this time. All right, you are remanded."

The "counsel" thus referred to may have been Mr. Blum since the judge had relieved Mr. Spence (Tr. 45) and reported the evident readiness of Mr. Blum to be substituted.

On the following Monday, however, having finally appeared in person, Mr. Blum declined the retainer. The trial judge reminded him that he (Blum) had told the judge he had been retained. Blum suggested that "possibly * * * the wording was misconstrued." The judge flatly rejected the possibility. Then, when petitioner suggested this left him "hanging in the air," the judge said this was not so and that the trial would begin right away. Turning back to Mr. Blum, the judge said that lawyer had been "utilized" by petitioner "as a foil for delaying this case." Likewise, he said, Mr. Spence had been imposed upon by "the defendant who obviously desires to try his own case." Petitioner promptly disclaimed any such desire. The judge insisted, over further protest, noting that a defendant "has a perfect constitutional right to represent himself * * *" (Tr. 52). Then the judge chided Mr. Blum some more; relieved Mr. Spence again (Tr. 54);

asked the latter to remain available to confer with petitioner; and "direct[ed] that the defendant * * * proceed as his own counsel." (Tr. 55.) Following a brief recess, jury selection began.

In a later recess, the trial judge denied petitioner's motion to dismiss for failure to give him a speedy trial, taking the occasion to mention again "for the sake of the record * * * [his] opinion that [petitioner's] tactics * * [had] been calculated to delay the trial of this case." (Tr. 72.)

Handling his side of the jury selection process, petitioner sounded sensible enough for a while. He soon lapsed, however, into what the jurors could only view (considering the record ultimately made) as gross imposition, fantasy, or some other form of inappropriate diversion.[6] He indicated, though he never established, his status as a "former Federal police officer" (Tr. 77), a "Secret Service agent" (Tr. 79) "who completed an F.B.I. course" (Tr. 80), and an employee of a lavishly generous charitable foundation (Tr. 81). He scattered other irrelevancies of a potentially self-damaging nature. Mr. Spence, standing by as advisor, was led to ask the panel members whether petitioner's questions, or the manner of his asking them, might themselves have generated bias or prejudice (Tr. 100–101).

As the trial proceeded from this dissonant first note, the judge made repeated efforts to protect and assist petitioner. The prosecutor showed restraint, objecting only *in extremis* to petitioner's unorthodox tactics as his own lawyer. But the "defense" was a farce. Against an evidently strong case for the prosecution, petitioner's efforts for himself served only to make exceedingly improbable that any juror would

---

and those of the People. This Court has been four days in this case, to the detriment of other defendants who have been pressing for trials here." (Tr. 40–45.)

6. It bears mention that the jury—considering the court's charge and the nature of

the crime, which New York law identified with automatic suspicions of aberration, note 1, *supra*—was free in the end to conclude that petitioner was mentally unbalanced and at the same time to find him guilty.

vote to let him leave the courtroom a free man.

Having referred early, in perhaps understandable exasperation, to petitioner's "ableness" as an indication of his desire to proceed *pro se*, the judge soon expressed doubts about that course. Following selection of the jury, he asked in chambers whether Mr. Spence considered that petitioner was "capable of understanding [the] proceeding." (Tr. 133.) Spence said he thought so. Petitioner was more certainly of the same view (Tr. 134). The judge then stated he had received a report of an assault and attempted sodomy by the petitioner, with a boy prisoner as the victim, on the night before in the jail. He accepted the assurances of Spence and petitioner, however, as to the latter's competence (Tr. 134–35).

When petitioner pressed for a seemingly extravagant roster of witnesses to be subpoenaed, the judge recorded his concurrence "in the opinion of Judge Dillon, as to the fact that the superficial knowledge of the law that the defendant has is a manifestation of some of the difficulties for which he was committed to the Matteawan State Hospital" (Tr. 183). Judge Dillon had expressed that view in October 1962 in justifying his determination that petitioner was incompetent then to stand trial. Petitioner proceeded to buttress such a judgment as he engaged in futile arguments with the witnesses against him; called witnesses who had no relevant knowledge or only knowledge hurtful to him; and, in a word, helped to make his own conviction a certainty.[7]

---

7. Having studied the state trial transcript and the seemingly pertinent authorities hereinafter cited, this court met in one of several informal discussions with counsel and expressed the fairly strong prediction that the case was one for issuance of the writ. Resisting that tentative conclusion, counsel for respondent urged that there was need for an evidentiary hearing. Specifically, in an affidavit sworn May 6, 1969, an Assistant Attorney General wrote (p. 7):

"A central question presented here is whether the state trial judge was justified in his conclusion, as shown by the minutes, that Cole was engaging in dilatory tactics. This question can be answered only if the testimony of the state trial judge is heard. Moreover, the attorneys involved, Messrs. Spence, Blum and McGuire, the judge's secretary, Mr. Stradella, the petitioner's mother, and petitioner himself should all testify. All of these witnesses could shed considerable light on the matter."

Doubting this, and questioning especially how far the state judge would wish to testify now about his "conclusion, as shown by the minutes," in a trial over three years ago, this court invited the Assistant Attorney General to supply affidavits showing more specifically the quantity and character of the "considerable light" to be expected from these proposed witnesses. Responding to this in a further affidavit of May 20, 1969, respondent's counsel reported that the trial judge, his then law secretary (now himself a judge) and the prosecutor all had only such "specific recollections" as "would be largely confined to the record." Messrs. Spence and Blum were reported to have expressed concern about the attorney-client privilege, but to be "willing" to give testimony if compelled. So there appeared little, after all, to expect from a hearing. And petitioner sought none. But respondent persevered in the view that the court should either deny the writ without a hearing or "that the respondent be given an opportunity to cross-examine Cole and his attorneys, Messrs. Blum and Spence." *Id.*, p. 4. Out of what was thought to be abundant caution, this court set a hearing for June 2, 1969. Petitioner was brought on a writ to participate and be available for the "opportunity to cross-examine" assertedly desired by respondent. Mr. Blum, alerted by respondent's counsel to be available as a witness, came timely to the courthouse. Counsel for petitioner formally introduced the state trial transcript as an exhibit, and rested, in line with his position that there was no need for more evidence. Counsel for respondent, saying petitioner had not carried his burden of proof, moved to dismiss the petition. The motion was denied. Then respondent rested. The court reminded the Assistant Attorney General that the "opportunity" theretofore demanded was about to stop knocking. Counsel held to his position, as was his right, and the "hearing" aborted.

## II.

The foregoing facts, at least in the judgment of this court, compel a finding that the petitioner was denied due process in his state trial.

In the circumstances of this case, it was patently unfair (in the most fundamental sense of that vital, if sometimes overworked, legal conception) to force petitioner to trial serving involuntarily as his own bizarre and self-destructive lawyer. There was no justification for the sudden haste. And it should have been clear from the outset that this prisoner, having spent most of the nine years since his alleged crime as a certified incompetent, was among the least likely of all people in the world to be capable of defending himself effectively.

For whatever unknowable and immaterial reason, the state trial judge seems to have reached an early conviction that the process due Mr. Cole should be weighted with a heavy presumption against any show of patience or attempt at understanding. The judge announced on Monday, November 1, 1965, that he knew nothing about the case except that it was a very old one. Two days later, when Cole came back out of the lockup to say he had dismissed his counsel, the judge said this looked like a ploy for delay. Part of the solid and experiential basis for this impression was, as the judge said, the evident last-minute character of the asserted desire to change lawyers. But then, minutes later, petitioner managed to convey that he had been seeking for weeks or months to substitute counsel, with the apparent help of his family on the outside. That revelation, somewhat contradictory of the trial court's first apperception, led immediately to an identical and reinforced judgment; the judge said he was "more convinced than ever that the defendant's tactics [were] dilatory in nature, and * * * designed to prevent his case from going to trial * * *."

That prompt certainty is especially remarkable because no attempt was made to determine whether there were any grounds for it more secure than a few seconds of unenlightening colloquy. Petitioner was a prisoner. He had already "served" nine years without a trial. For most of that time he had been "exposed * * * to extraordinary hardships, and caused * * * to suffer indignities, frustrations and dangers, both physical and psychological, he would not be required to endure in a typical prison setting." United States ex rel. Schuster v. Herold, 410 F.2d 1071, 1078 (2d Cir. 1969). Assuming, *arguendo* and *dubitante*, he was sane in any pertinent sense, what conceivable benefit could he have sought by "dilatory tactics"? The record suggests none. The trial judge stated none. Nor did the judge spend any time at all talking to petitioner—whether in the form of "cross-examination" or otherwise—to expose the motives prompting the proposed change of counsel.

The need to go ahead at top speed was trivial. The case was nine years old. Petitioner rather than the State had been the one pressing for a trial. As the prosecutor said in a post-trial affidavit, "the trial of the defendant occurred more on his insistence than on the part of the People * * *."

Having been denounced as a temporizing obstructionist on Wednesday, November 3, petitioner was put to trial (with himself as egregiously incompetent counsel) on Monday, November 8, 1965. But even that constricted period, including only two business days, was not given as an assured and uninterrupted time when he (in jail), or others for him, might nail down arrangements for substituted counsel. Instead, being informed that petitioner seemed on the verge of retaining Mr. Blum, the judge adjourned the case only from Wednesday to Thursday morning. On Thursday morning, recording his information that petitioner's mother had succeeded in retaining Blum, the judge ordered the jury panel brought to the courtroom; received information that petitioner had before then switched lawyers more than

once during his nine years of imprisonment without a trial; and took the occasion to express once more his disapproval of such "tactics."

When petitioner proceeded to orate about the Constitution—and about the scarcely frivolous thought that *he* had suffered injurious delay—the judge proposed to act right away on the ironical jest that the prisoner's legal talents reflected an obvious desire to defend himself. A few minutes later, however, the judge was informed that Mr. Blum was expected that afternoon, and he adjourned the trial until then. In the afternoon, Blum did not appear. The trial, the judge then announced, would begin the next morning. He also took pains at this point to record that he had been mistaken in saying earlier in the day that Blum had been retained as counsel by petitioner's family on the outside. Having corrected his misunderstanding of what a court clerk, familiar with court business, had told him, the judge remanded petitioner. Nobody stopped, then or thereafter, to inquire whether petitioner, so long imprisoned, might reasonably or possibly have garnered the same sort of misinformation. Nobody tarried, either, to think how or by whom petitioner would be represented at the trial scheduled for the next morning in light of the confusion which had seemingly been afflicting both the prisoner and the court.

On the next morning, Friday, November 5, the pall of uncertainty was, if anything, thickened. Blum was reportedly expected on Monday, November 8. Petitioner, making explicit that he was relying (understandably) on what the court had told him, said he was counting on Blum to appear for him on Monday. Nothing was done, if anything could have been done, to correct the grounds for what turned out to be

a mistaken expectation. The prosecutor contributed a show of asserted public hurt, by no means an impressive instance of its kind, and petitioner was silenced when he sought to answer because, the judge said, he was "represented by counsel * * *." With Spence having been relieved and Blum yet to appear, it is not possible to know what that was intended to mean to the petitioner as he was being remanded for the weekend before his trial.

When the long-awaited Mr. Blum finally appeared on Monday, the judge made clear his view that this attorney had not handled his role in the business with entire punctiliousness. Then, however, he dismissed Blum as petitioner's hapless "foil," and proceeded immediately to the trial in which petitioner, protesting, played out his grim burlesque as counsel *pro se*.

It is impossible and unimportant to know whether the jurors perceived petitioner as a fool, a faker, a psychotic, or some variant or combination. Any of such likely appraisals was consistent under the court's charge with a guilty verdict. And the prosecution's evidence, enhanced rather than impaired by petitioner's efforts, appears to have been powerful. Two youths in their early twenties (11 and 13 years old, respectively, at the time of the alleged crimes) gave direct, circumstantial, seemingly matter-of-fact accounts of petitioner's sordid assault upon the younger of them. Their cross-examination by petitioner was worse than useless for him. If this left his doom incompletely sealed, the possibility of a miracle disappeared as he paraded before the jury a trio of ostensible defense witnesses whose conceivably relevant knowledge ranged from nothing at all to some probably hurtful details.[8]

---

8. Petitioner called a police officer to prove he had been in an automobile collision some two weeks before the crimes, which were alleged to have occurred when the boy victim and his brother were passengers in petitioner's automobile. Whatever petitioner had in mind, this evidence synchronized damningly with the prosecution's proof that petitioner's car, at the time of the assaults, was missing a fender. In one of his few comments on the evidence, while overruling a prosecution ob-

Although the seemingly inevitable verdict leading to a sentence of 15 to 20 years required scarcely more than an hour of jury deliberation, it need not have been, in the hands of moderately competent counsel, "a very simple case." See United States v. Mitchell, 354 F.2d 767, 769 (2d Cir. 1966). Petitioner's known history, extending from a time close to the date of his alleged crimes over long years of incarceration, would have alerted any lawyer in a few seconds to potentially substantial questions concerning sanity—both when the acts charged occurred and at the time of trial. It is arguable that the patent evidence before him required the trial judge to raise such questions on his own motion, especially where defendant was conducting his own tragically comic "defense." Cf. Overholser v. Lynch, 109 U.S.App.D.C. 404, 288 F.2d 388, 393 (1961), rev'd on other grounds, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962); People v. Gonzalez, 20 N. Y.2d 289, 295, 282 N.Y.S.2d 538, 543, 229 N.E.2d 220 (1967) (concurring opinion); N.Y.Code of Criminal Procedure § 658. Passing that, the point is of immediate consequence because it underscores the obviously urgent need this petitioner had for the services of a trained, objective attorney.[9] This factor weighs heavily against the haste with which petitioner was rushed to the trial of his own case.

■ All the pertinent factors taken together, and considered in the light of recent and controlling precedents, compel a judgment that this petitioner was denied the due process of law when he was refused a further adjournment for the procurement of counsel. It is clear, of course, that we must not allow the right to counsel to be wickedly or perversely exploited as a device for obstruction. United States v. Llanes, 374 F.2d 712, 717 (2d Cir.), cert. denied, 388 U.S. 917, 87 S.Ct. 2132, 18 L.Ed.2d 1358 (1967), and cases cited. There is an urgent public interest, which we are not adequately vindicating these days, in the decently expeditious administration of criminal justice. This interest must be part of the reckoning, along with asserted grounds for delay, as trial judges make the compendious judgments required every day for the handling of criminal calendars. The sudden, unexplained announcement of a defendant that he wants a new lawyer, made at the outset of, or during, a trial, need not be permitted to stop the wheels of justice. The task of weighing the defendant's interest in counsel of his choice, of estimating whether an alleged change of mind is genuine or a stunt, of balancing opposed needs of the public and the prosecutor's office—such matters call for the sensitive appraisal of the particular facts of individual cases. See Unger v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964). Like other aspects of criminal proceedings, this one inevitably demands a considerable measure of reliance upon the good sense and discretion of trial judges. United States v. Mitchell, *supra*, 354 F. 2d at 767.

But the Constitution imposes a momentous limit: to insure that the right to counsel will serve as an effective reality, it commands that a defendant, in situations like the one here, be "given a reasonable opportunity to retain counsel of his own choice * * *." United States ex rel. Davis v. McMann, 386 F. 2d 611, 620 (2d Cir. 1967), cert. denied, 390 U.S. 958, 88 S.Ct. 1049, 19 L.Ed.2d 1153 (1968); United States ex rel. Hig-

---

jection, the trial judge noted this corroborating effect of Cole's pathetically counter-productive "defense" (Tr. 423–24). The prosecutor, understandably, took advantage of this assistance in his summation (Tr. 468).

9. Compare United States ex rel. Higgins v. Fay, 364 F.2d 219, 222 (2d Cir. 1966),

affirming a grant of habeas to a defendant who had been forced to trial *pro se* in otherwise troublesome circumstances, and observing along the way that "[t]he jury was not charged on the defense of intoxication."

gins v. Fay, 364 F.2d 219 (2d Cir. 1966); United States v. Mitchell, *supra*; United States v. Johnston, 318 F.2d 288 (6th Cir. 1963).

The series of adjournments in this case—a grudging, unnerving half-day at a time—fell short of anything that might possibly be thought reasonable in the circumstances. Cf. United States ex rel. Davis v. McMann, *supra*, 386 F. 2d at 611, 619, 620; United States v. Mitchell, *supra*, 354 F.2d at 768; United States v. Johnston, *supra*. The state had held petitioner as its incompetent, untried prisoner for over nine years. There was no trace of adequate reason— and respondent has yet to suggest any— why another week or month would have made a meaningful difference.

The deprivation petitioner claims was more starkly unreasonable than that in any of the foregoing cases. This ground in itself requires issuance of the writ he seeks.

### III.

A subject touched in the preceding discussion merits isolation and separate emphasis. The state trial record is filled with grounds for grave, but unexplored, questions as to petitioner's sanity, both at the time of the events in 1956 and during the trial nine years later. Though the matter is not free from doubt, I hold that the trial court's failure to deal adequately with this problem supplies independent grounds for issuance of this court's writ of habeas corpus. Whether or not this is so, the state court's own (and plainly well-founded) doubts on this score add to the gravity of the error in making petitioner serve as his own defense lawyer.

The trial judge not only raised questions as to petitioner's competence even to stand trial (let alone defend himself); he also saw fit to put on the record his concurrence in the views of another judge who had found petitioner incompetent three years earlier. This troublesome matter could not be dismissed merely by taking the curbstone views of a dismissed (and evidently long-suffering) defense lawyer and of petitioner himself. Nor did it matter that another judge, some six months before the trial, had ruled with petitioner (over the State's opposition) that he had become competent to be tried. That could hardly be dispositive in the case of a man who in the space of a month in 1962 had (1) been found competent, (2) attempted suicide, and (3) been locked up again for what turned out to be almost three more years before being found capable once again of participating in his own defense.

■ This was, in short, the clearest kind of case in which the trial court was required to hold a hearing on petitioner's competence to stand trial— even with counsel. Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); United States v. Collier, 399 F.2d 705 (7th Cir. 1968); Pouncey v. United States, 121 U.S.App.D.C. 264, 349 F.2d 699 (1965); People v. Gonzalez, 20 N.Y.2d 289, 293, 282 N.Y.S. 2d 538, 541, 229 N.E.2d 220 (1967). The failure to do that is, under the cited cases, a fatal constitutional flaw in the conviction.

■ Opposing that view, respondent urges (correctly) that the question is one which has not been exhausted in the state courts. But if there ever was a case where reliance upon the exhaustion doctrine would be a hollow exercise in etiquette, this is it. There is no suggestion of any meaningful thing other than more delay to be accomplished by remanding this fully developed issue to the state courts. Cf. United States ex rel. Lusterino v. Dros, 260 F.Supp. 13, 17 (S.D.N.Y.1966). Respondent does say that the New York tribunals might at this late date "order a *nunc pro tunc* competency hearing," as was done in People v. Hudson, 19 N.Y.2d 137, 278 N.Y.S.2d 593, 225 N.E.2d 193 (1967). The short answer is that such a course would be an absurdity. We are explicitly informed that the trial judge and other participants have nothing to offer in the way of "contemporaneous ob-

servations" (*id.* at 140, 278 N.Y.S.2d 593, 225 N.E.2d 193) beyond what the transcript conveys. It is not conceivable that any reliable finding could be made now as to petitioner's competence almost four years ago. There is no basis whatever for avoiding the squarely apposite command of Pate v. Robinson, *supra,* that the State choose between releasing petitioner and affording him a new trial, to begin with an inquiry into his competence. There is, in a word, no reason in the State's own interest for burdening "its judicial calendar" with an issue like this, "which is predetermined by established federal principles." Roberts v. La Vallee, 389 U.S. 40, 43, 88 S.Ct. 194, 196, 19 L.Ed.2d 41 (1967); see also Pope v. Harper, 407 F.2d 1303 (9th Cir. 1969); Thomas v. Cunningham, 335 F.2d 67, 69–70 (4th Cir. 1964).

The circumstances all combine to make applicable the principle that exhaustion is not a jurisdictional condition, but a matter for discriminating judgment—to be guided always by respectful deference to the rightful province of state tribunals, but not to be trivialized by holding mechanically that every claim under the Federal Constitution must be rehearsed in state court before it may be vindicated in the federal courts. Fay v. Noia, 372 U.S. 391, 419–420, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Williams v. Coiner, 392 F.2d 210, 213 n. 2 (4th Cir. 1968).

To summarize, this court concludes that either of the two grounds outlined above—the substantial denial of the right to counsel and the failure to hold a hearing on competence—would suffice to sustain the petition.[10] Accordingly, the application will be granted. Petitioner is to be released from confinement under the sentence he has been serving unless within thirty days from this date, the State proceeds to retry him. Should respondent appeal within fifteen days from this date, this court's order is stayed pending expeditious prosecution of the appeal, and subject, of course, to other or different directions by the Court of Appeals.

It is so ordered.

---

10. Petitioner's assigned counsel suggests that the second point, under Pate v. Robinson, should not be reached because he fears that "the injection of an unexhausted claim may, in fact, be prejudicial." Having decided, for reasons which are obviously debatable, that the second ground should be reached, this court concludes with greater confidence that the fear of possible prejudice is in any event misconceived. The undisputedly ripe, and separately decisive, first ground cannot be diminished by the second, whether or not the latter should ultimately stand as independently decisive. This should be especially clear where the solecism, if there is one, is the court's rather than that of counsel or the prisoner.