**UNITED STATES of America ex rel. Marvin KAYE, Petitioner,**

v.

**John L. ZELKER, Warden, Green Haven Prison, Respondent.**

**No. 71 Civ. 491.**

United States District Court, S. D. New York.

Nov. 13, 1972.

William P. Ford, New York City, for petitioner.

Louis J. Lefkowitz, Atty. Gen. for State of New York, Albany, N. Y. and New York City, Robert S. Hammer, New York City, of counsel, for respondent.

## MEMORANDUM

TENNEY, District Judge.

Petitioner, Marvin Kaye, is presently incarcerated in Green Haven Correctional Facility, Stormville, New York, pursuant to a judgment of conviction rendered in Supreme Court, New York County. Kaye, indicted for murder in the first degree in August 1965, pleaded guilty to manslaughter in the first degree on October 11, 1966, and was sentenced to imprisonment for a term of ten to fifteen years.

Petitioner alleges as the basis for his application for writ of habeas corpus: (1) that his confession, which was adjudged voluntary, was in fact inadmissible; (2) that his plea of guilty was not a valid plea due to his mental incompetency at the time of the plea; and (3) that the facts to which he admitted on the occasion of his plea did not constitute the crime of manslaughter in the first degree.

The undisputed facts are as follows: On the evening of July 5, 1965, William Gold, an attorney, received an urgent phone call from Kaye, who requested that Gold meet him at his (Kaye's) hotel room. When Gold arrived at the hotel, he found the room in disarray, Kaye in a distraught condition, and the lifeless body of a young boy. After several hours of "discussion" with Kaye, Gold was able to convince the petitioner to accompany him to the Bellevue Psychiatric Ward.

Early in the morning of July 6, 1966, Gold telephoned the New York City Police Department, 20th Precinct, and informed the desk sergeant that he wished to surrender his client, Marvin Kaye, in connection with a murder. The desk sergeant, in turn, telephoned the 20th Detective Squad and spoke to a Detec-

tive McNally. As a result of this call, McNally and his partner, Detective Maline, proceeded to the Stratford Arms Hotel at 117 West 70th Street and there discovered the body of a thirteen-year-old boy, later identified as one Harry Bernstein. The boy apparently had been strangled. McNally then called Gold, who was at the Bellevue Hospital Psychiatric Ward, and told Gold he was on his way over. When the detective arrived, Gold introduced himself as Kaye's attorney.

It is at this point that the petitioner's and the police's version of the facts (as recounted at the *Huntley* hearing) begin to differ. Gold testified that he had informed Kaye of his right to remain silent and that he had not wanted the petitioner to say anything to the police. Gold then had informed the police detectives McNally and Maline that he did not want his client questioned in his absence, either en route to the precinct house or by the Assistant District Attorney at the precinct house. Gold further testified that he had expressed a desire to accompany Kaye to the precinct house but had been advised by the detectives that it was not necessary because Kaye was not going to be questioned. After having given the detectives his card and having asked that they call him if the petitioner was to be questioned, Gold had gone home. When he appeared in court the next day for Kaye's arraignment, he discovered that Kaye had made an incriminating statement the night before.

Detective McNally testified that he had asked Gold if he wished to accompany his client to the station house, but that after being assured that Kaye would not be mistreated, he had declined the invitation. McNally also recalled that he had been informed by Gold that Kaye had been apprised of his rights and that Kaye probably would not make a statement. Detective Maline's testi-

mony was to the same effect, except that Maline testified he had been the one who had invited Gold to accompany them to the station house.

The detectives then testified that almost immediately after entering the police car, Kaye had begun to blurt out incriminating statements; that they had informed him that he did not have to make any statements; and that, nonetheless, Kaye had continued making the statements until he had confessed to the murder of the boy. All of this was said to have taken place without any questioning or coercion by either of the detectives.

Kaye testified that the detectives had begun to intimidate him as soon as the ride to the precinct house began. This intimidation consisted of statements such as: "You're in big trouble"; "We can help you or hurt you"; "If you're not going to make a statement, and you're going to make fools out of us, there's ways of making you have a statement made." Kaye stated that he had asked for his lawyer several times and that the detectives had never warned him of his rights. Both Kaye and Gold testified that the petitioner had been arrested several times before the arrest in question, and that on two occasions he had been physically beaten by the police. As a result of this prior treatment, Kaye said, he had been extremely frightened that the detectives, on the night in question, would do the same (particularly in the light of the intimidating remarks). Kaye testified that because of this fear, and because Gold had instructed him to talk if he thought he would be beaten, he had made the incriminating statements.[1]

After taking extensive testimony at the *Huntley* hearing, the trial judge ruled that the statements made in the police car to the detectives were voluntary and thus admissible. More specifically, the court found "beyond a reasonable doubt that the oral statement by

---

1. Kaye also confessed when questioned by the district attorney, but these statements are not in issue since they were never offered by the State as evidence and were declared inadmissible by the trial judge.

the defendant to the police officer was voluntary and is admissible as evidence" (H.H. at 373–74) ;[2] "that the defendant was fully apprised of his constitutional rights both by the police officers and by his retained counsel" (H.H. at 374); and "that the statement made by the defendant was a spontaneous reiteration of the facts impelled, probably, by his wanting to unburden his conscience and was not due to any coercion or fear of physical violence attributable to any action or threat on the part of the police officer." (H.H. at 374–75.) During the selection of the jury Kaye withdrew his plea of not guilty and offered a plea of guilty to manslaughter in the first degree, reserving his right to appeal the decision rendered in the *Huntley* hearing pursuant to N.Y.Code Crim.Proc. § 813–g (McKinney Supp.1971), as amended, N.Y.C.P.L. § 710.70(2) McKinney's Consol.Laws c. 11–A, 1971. The plea of guilty was accepted and Kaye was sentenced to a term of ten to fifteen years imprisonment.

The *Huntley* hearing decision was appealed, and both the Appellate Division, People v. Kaye, 31 A.D.2d 536, 295 N.Y. S.2d 81 (1968) (one judge dissenting), and the New York Court of Appeals, People v. Kaye, 25 N.Y.2d 139, 303 N.Y. S.2d 41, 250 N.E.2d 329 (1969) (two judges dissenting), affirmed the findings of the trial court. Petitioner did not dispute that he was legally sane at the time of the crime and at trial. Moreover, the dissents in the appellate courts were not based on disagreement with the factual determination by the trial judge, but on the proposition that even a volunteered statement made in the absence of counsel is not admissible when a defendant has been arrested and taken into custody and his lawyer has informed the police that he has advised the defendant not to make any state-

ments. Kaye then applied to this Court for a writ of habeas corpus on the grounds that his confession was involuntary, that he was incompetent to plead guilty, and that the facts which he admitted at the time of the plea did not constitute the crime of manslaughter in the first degree. A hearing was ordered and held at which Kaye, Gold, and Doctor Edward F. Falsey, a psychiatrist, testified.

Both Kaye's and Gold's testimony added little, if anything, to their testimony at the *Huntley* hearing.[3] Dr. Falsey, who based his evaluations on two interviews with the petitioner, petitioner's Bellevue Hospital records (including psychiatric reports), and his testimony at the *Huntley* hearing, testified on direct examination essentially to three things: (1) that in his opinion Marvin Kaye was insane in July 1965 (the time of the murder); (2) that he thought Kaye had made the statements to the police only to avoid what Kaye had perceived as a threatening situation; and (3) that Kaye's testimony and behavior on the witness stand at the *Huntley* hearing would lead him (Dr. Falsey) to question Kaye's sanity at the time of the hearing. Dr. Falsey did, however, qualify the last proposition in the following exchange on direct examination:

"Q. Is it your further testimony, Doctor, that at the time of the Huntley hearing testimony of Mr. Kaye and, of course, shortly after that time his guilty plea, that there was enough past history and outward signs to indicate that there was a question as to whether or not Mr. Kaye could knowingly and voluntarily enter a plea of guilty?

A. From reviewing the record, I would suggest that it would have been appropriate to review his mental condition at that point. *I was not there,*

---

2. H.H. refers to the *Huntley* hearing transcript.

3. Gold did, for the first time, relate the actual events and conversations that had transpired when he first went to Kaye's

hotel room. These events were not probed at the *Huntley* hearing because of a possible abuse of the attorney-client privilege. Kaye also went into a little more detail as to his mental state at the time of the boy's death.

*and I think in retrospect I cannot rec-
ommend that something else should
have been done. But in the light of
the future developments and what we
see today with Marvin Kaye, I think
he was sick then and has continued to
be.*" (Emphasis added.) (Tr. 162–63.) [4]

On cross examination, Dr. Falsey fur-
ther qualified his direct testimony:

"Q. There can always be differences
of opinion among equally qualified,
sincere, and well-intentioned [psychia-
trists] ?

A. Correct.

Q. . . . Are you not in the posi-
tion of having to act more like the
Monday morning quarterback?

A. . . . A Monday morning
quarterback is someone who, in retro-
spect, tries to outwit the leader of the
team at the time of the encounter.
This may be a fair designation of my
present requirement.

Q. Doctor, in your opinion, who was
in a better position, all things being
equal, to judge the mental condition
and mental capacity of this petitioner;
yourself, or the doctors who examined
him?

A. At what point in time? I think
I am right now.

Q. In terms of the mental capacity,
say, in July of 1965 and October of
1966, who was in a better position to
give the best evaluation of his mental
condition?

A. Well, at that time, the ones who
saw him and examined him obviously
knew more about him than I did, be-
cause I had not met the man.

Q. Is it possible that they may have
absorbed impressions and information,
scent data, if you will, that somehow
could not necessarily be reduced to a
written synopsis?

A. This is quite correct.

Q. Like trying to read a record as
opposed to having actually been
present at the trial, is that the same

sort of thing? Would that be a fair
analogy?

A. I suppose so. There is an analo-
gy in that." (Tr. at 64–65.)

■ Respondent contends that habeas
corpus is not available to petitioner to
challenge the judgment of conviction un-
der which he is confined, except as to
those matters going to the validity of
the plea of guilty upon which it is based.
However, McMann v. Richardson, 397
U.S. 759, 770 n.s. 11 & 13, 90 S.Ct. 1441,
25 L.Ed.2d 763 (1970), did not decide
whether a conviction, based on a plea of
guilty entered pursuant to N.Y.Code
Crim.Proc. § 813–g (McKinney Supp.
1971), as amended, N.Y.C.P.L. § 710.-
70(2) (McKinney 1971), would be open
to attack in federal habeas corpus pro-
ceedings on the ground that the confes-
sion was coerced, and the controlling law
in this circuit permits such an attack.
United States ex rel. B. v. Shelly, 430
F.2d 215, 217 n. 3 (2d Cir. 1970); Unit-
ed States ex rel. Molloy v. Follette, 391
F.2d 231, 232 (2d Cir. 1968); United
States ex rel. Rogers v. Warden, 381 F.
2d 209, 214–215 (2d Cir. 1967).

■ Although respondent has not
raised the question of the deference re-
quired to be given to the determination
of voluntariness by the state court under
28 U.S.C. § 2254(d) (1970), it has not
admitted that any of the eight excep-
tions under that subsection are applica-
ble to the state court hearing. Accord-
ingly, it must be presumed that the
finding by the trial court is correct un-
less petitioner can establish, or it shall
otherwise appear, that any of such ex-
ceptions are applicable. Where, as here,
the state court has held a full eviden-
tiary hearing on the voluntariness of ad-
missions, its "findings are presumed to
be correct unless petitioner can establish
one of the eight statutory exceptions in
28 U.S.C. § 2254(d), which limits the
scope of review on habeas corpus of
questions arising after a state court
hearing." United States ex rel. Sabella

---

4. Tr. refers to the transcript of the hearing ordered by this Court.

v. Follette, 432 F.2d 572, 574 (2d Cir. 1970), cert. denied, 401 U.S. 920, 91 S. Ct. 905, 27 L.Ed.2d 822 (1971). It should be borne in mind that the voluntariness of admissions may be judged by the standard of "a preponderance of the evidence." Lego v. Twomey, 404 U.S. 477, 482–487, 92 S.Ct. 619, 623–625, 30 L.Ed.2d 618 (1972). This standard clearly was met in the instant case in the state court.

■■■ Petitioner's second ground for invocation of the writ, *i. e.* that his plea of guilty was not a valid plea due to his mental incompetency at the time of the plea, was never directly raised in the state appellate proceedings. On the other hand, it can be held that his competency, at least at the time of his confession, was indirectly before the trial court in its determination that his admission was voluntary and that, accordingly, that issue had been "fairly presented" to the state courts. Picard v. Connor, 404 U.S. 270, 275–276, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971). However, while petitioner may not have exhausted his state remedies on the issue of his competency, "exhaustion is not a jurisdictional condition, but a matter for discriminating judgment." United States ex rel. Cole v. Follette, 301 F. Supp. 1137, 1150 (S.D.N.Y.1969), aff'd, 421 F.2d 952 (2d Cir. 1970). The failure of the state court to reach the issue of incompetency does not preclude petitioner from seeking relief in the federal court. Noble v. Sigler, 351 F.2d 673, 676 (8th Cir. 1965). Accordingly, this Court has proceeded to hold a hearing as already noted and finds, on the basis of that hearing and the record herein, that petitioner's claim as to his incompetency at the time of the guilty plea must fail.

Petitioner contends that before accepting the guilty plea the trial court was bound *sua sponte* to hold a hearing on the question of petitioner's mental competency, on the authority of Pate v. Robinson, 383 U.S. 375, 385–386, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). However, *Pate* is clearly distinguishable since, in that case, the defendant's counsel, at the time of trial, claimed that defendant was insane when the crime was committed and also was incompetent to stand trial. No such claim was made in the instant case. In addition, four witnesses testified as to Pate's insanity, whereas there were no such witnesses at Kaye's trial. Finally, expert evidence on the question of Pate's competency to stand trial was excluded by the trial judge. In the instant case, the trial judge had before him a psychiatric report attesting to petitioner's competency to stand trial.

■■ Nor should the fact that this Court, in the exercise of caution as well as discretion, granted petitioner a hearing in support of the charges made in his petition, constitute a holding that the state court, *sua sponte*, should have held a hearing to determine petitioner's competency. A defendant is not denied due process by the *sole* fact of his being allowed to plead guilty without there first being a formal adjudication of his sanity. United States ex rel. Smith v. Baldi, 344 U.S. 561, 73 S.Ct. 391, 97 L. Ed. 549 (1953); Noble v. Sigler, *supra*, 351 F.2d at 676.

The trial judge who accepted the plea had just completed a lengthy *Huntley* hearing in which the details of petitioner's past history had been explored, in great part by means of petitioner's own testimony. Furthermore, shortly after petitioner's arrest he was committed to the Bellevue Hospital Center for a psychiatric report and the trial judge had received such report, dated October 21, 1965, finding petitioner to be "Without Psychosis; Markedly Schizoid Personality with Sexual Deviation and sporadic drug intoxication." This report found that petitioner was "not in such a state of idiocy, imbecility or insanity as to be incapable of understanding the charge, indictment, proceedings, or of making his defense." If petitioner or his counsel was not satisfied with the report, he had a statutory right to contest it. N. Y.Code Crim.Proc. § 662-c (McKinney 1958) as amended, N.Y.C.P.L. § 730.-30(2) (McKinney 1971). This he failed

to do. On the basis of the record before him the trial judge was clearly justified in not holding a hearing *sua sponte* with respect to petitioner's competency, and on the same record this Court would be equally justified in denying the writ without a hearing. United States ex rel. Evans v. LaVallee, 446 F.2d 782 (2d Cir. 1971); Clark v. Nelson, 442 F.2d 413 (9th Cir. 1971).

In the hearing before this Court, petitioner and the attorney who initially represented him at the time of the arrest testified generally with respect to the same matters covered in the *Huntley* hearing. Nothing of substance was developed by these witnesses in connection with petitioner's admissions. The principal and only "new" witness was a psychiatrist appointed by the Court at the request of petitioner's counsel. Although he testified in connection with petitioner's admission that it was "possible that such a statement might be given without regard to the objective truth or falsity of what he was saying" (Tr. at 45), this falls far short of a finding of involuntariness. Concededly, he did not concern himself with legal insanity (Tr. at 70–71). His examination of petitioner consisted of a review of petitioner's past history, the court records, and interviews with petitioner years after the events in question took place. He admitted that the Bellevue finding of "no psychosis" was not consistent with his own findings (Tr. at 50). Petitioner himself testified that he had understood the charges against him and that he had in fact cooperated with counsel in preparing his own defense and that he had made reasonable judgments and decisions as to what, in fact, was in his best interests (Tr. at 108–17). Moreover, petitioner never called the lawyer who represented him at the *Huntley* hearing and at his guilty plea. This prospective witness could have testified as to whether he was able to communicate with petitioner and whether petitioner knew the nature of the charge and was able to cooperate in his own defense (Tr. at 18–20). It seems clear that petitioner was fit to stand trial and to plead guilty. United States ex rel. Roth v. Zelker, 455 F.2d 1105, 1108 (2d Cir. 1972).

 Finally, petitioner urges that at the time of his plea he did not admit facts which could support a conviction of manslaughter in the first degree. The record belies such a contention. The judge carefully explained what the crime of manslaughter in the first degree involved, including the element of "intent to injure but not to kill", and petitioner indicated his desire to plead to such a charge (Tr. at 389). Assuming that the claim is of constitutional dimensions, it does not appear ever to have been asserted in the state courts or that petitioner is precluded from asserting it there.

In conclusion, the Court wishes to express its appreciation to William F. Ford, Esq. for his diligent and conscientious representation of petitioner herein. However, for the foregoing reasons, the writ is dismissed.

So ordered.