**UNITED STATES of America,
Appellee,**

v.

**Tony SILVA, Appellant.**

**No. 293, Docket 32941.**

United States Court of Appeals
Second Circuit.

.Argued Oct. 14, 1969.

Decided Nov. 17, 1969.

Kristin Booth Glen, New York City,
*for appellant.*

Jerome C. Ditore, Asst. U. S. Atty.,
Eastern District of New York (Vincent
T. McCarthy, U. S. Atty., Eastern Dis-

trict of New York, on the brief), for appellee.

Before FRIENDLY, HAYS and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

The appellant, a 19-year old Puerto Rican, was arrested January 4, 1968, in connection with the August 10, 1967, robbery of a branch of the First National City Bank on Springfield Blvd. in Queens, New York City. At his trial there was evidence, including a confession which he denied having made, from which the jury could have found that Tony Silva participated in the crime as lookout in a parking lot outside the bank. He was convicted of bank robbery with a dangerous weapon, in violation of 18 U.S.C. § 2113 (a) and (d), and conspiracy to commit the substantive offense for which he received sentences of twelve years and five years imprisonment, to run concurrently. In this appeal Silva challenges the use of his confession.

A hearing before the trial to determine the voluntariness of the confession disclosed that when he was arrested, Silva told an agent of the Federal Bureau of Investigation that he would commit suicide rather than stand trial. Within a few days after his arrival at the Federal House of Detention, he swallowed several articles—including, Silva said, half of a razor blade and some pieces of bed springs or bed spring connectors. He was taken to the prison ward of the psychiatric division at Bellevue Hospital, where x-rays were taken and he received some undisclosed treatment.[1] A few days later he was returned to the House of Detention, and he asked to speak to someone about a reduction in his bail. On January 17, he was taken to the United States Courthouse in Brooklyn to see an Assistant U. S. Attorney who had been informed that Silva wished to make a statement.

Silva had been questioned by F.B.I. agents three times previously concerning the Queens robbery, and on each occasion he had signed a waiver of his right to remain silent and made a statement denying his participation. The last such interrogation had taken place January 10, 1968, while the appellant was in the prison ward at Bellevue. One week later, on January 17, Silva met for about an hour and a half with the Legal Aid attorney who represented him. His attorney advised him of his rights, discussed the subject matter of a confession with him, and spoke to the Assistant U. S. Attorney about whether a confession would make it possible for Silva to be a cooperating witness at the trial of the other alleged participants in the robbery. The Legal Aid attorney then left Silva alone with the prosecutor and two F.B.I. agents, who spoke to him for two hours and drafted a detailed statement concerning his participation. Silva had again signed a waiver. After being allowed to make a telephone call to his mother, who informed him that she would retain counsel for him, he refused to sign the confession.

At this hearing on voluntariness Silva denied having made any confession, and also testified that he had previously undergone treatment at various hospitals for psychiatric disorders, that he had told the prosecutor about having hallucinatory visions, his use of heroin prior to his arrest, and several attempts to com-

---

1. Silva testified at the hearing that x-rays had been taken, that he had not been operated upon, and that he had been told "they would come out by itself" [sic]. He added that he did not know whether all the objects had been removed. The prosecutor then made a joke of the whole situation by concluding examination of Silva with the remark:
    "You don't know whether you still have these bedsprings inside of you? Don't you twang every once in awhile, maybe?"
    At the trial, Silva elaborated upon these events by adding that he had spent two to four days at Bellevue and that,
    "I believe the doctor made me—he put something and made me swallow something back—"
    He continued to claim, however:
    "Something is still in my stomach to— I do not know if it is still in there."

mit suicide. Richard Rosenkrantz, the Legal Aid lawyer who had represented Silva at the time of his confession, stated that in view of this history another Legal Aid attorney had filed a motion requesting a mental examination of Silva even before he swallowed the articles at the House of Detention. Although the request that he be committed for a psychiatric examination was apparently foregone because Silva was already in Bellevue Hospital, the record is completely barren concerning the determination made there, if any, about his mental condition. The prosecutor stated at the hearing that he knew only that Silva was hospitalized a few days after swallowing some articles and was then released.[2]

The judge found that the appellant had been advised of his constitutional rights and that his confession was voluntary.

No defense of insanity was raised at the trial, but substantially the same testimony about the appellant's mental condition was introduced through Silva's own statements concerning suicide attempts and a previous history of psychiatric disorders. No request for a psychiatric examination was made during the trial; but at its conclusion, both the prosecutor and Silva's attorney asked the court to consider such a measure prior to sentencing.

Silva was sentenced, however, by another judge, after he expressed a desire to have it done promptly. A motion was made at that time for Silva's commitment under 18 U.S.C. § 4208(b) for a 90-day examination; but the motion was withdrawn. Nevertheless the sentencing judge, who had earlier observed that he was "obviously unfamiliar with the record of the trial," found no need for further investigation of Silva's mental condition in any event; he stated that he had reviewed a report of an examination of the appellant conducted at Kings County Hospital two years earlier, on July 20, 1966, from which he concluded:

> "The diagnosis was that he was emotionally unstable and I finally decided that no good purpose would be served by another examination."

The appellant's main contention in this appeal is that his confession should not have been found voluntary because there was no investigation of his mental competency to waive his rights and confess. We agree.

■ A confession or waiver of rights cannot be termed voluntary if it is made by a person whose mental condition at the time was such that "the confession most probably was not the product of any meaningful act of volition." Blackburn v. Alabama, 361 U.S. 199, 211, 80 S.Ct. 274, 282, 4 L.Ed.2d 242 (1960); see Westbrook v. Arizona, 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed. 2d 429 (1966); Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). Once it becomes apparent that the accused's mental condition is a factor that ought to be looked into in relation to the admissibility of his confession, the trial judge must hold a hearing at which relevant evidence may be offered, including the testimony of experts, from which the court will decide whether the accused was at the time he confessed so mentally ill that he was unable, with intelligence, knowledge and understanding, to relinquish or abandon a known right or privilege which was his; or whether "the confession most probably was not the product of any meaningful act of volition." If it is found that either of these things is so, the confession must be excluded. See Green v. United States, 128 U.S.App.D.C. 408, 389 F.2d 949, 952 (*en banc* 1967); Gladden v. Unsworth, 396 F.2d 373, 380–381 (9 Cir. 1968).

■ Even though Silva's mental competence was never placed directly in is-

---

2. One of the F.B.I. agents who visited Silva in the Bellevue prison ward a week before his confession testified that they made no effort to learn about the events which had placed him there.

sue, the testimony concerning the circumstances of his confession was such that the trial judge should have ordered a hearing *sua sponte* on the narrow issue of his capacity to make it. See Westbrook v. Arizona, *supra*; Pate v. Robinson, *supra*. He stresses his alleged history of psychiatric disturbances and suicide attempts simply as background to the question of his competence at the time of the confession.

We do not understand *Westbrook* and *Pate* to have enunciated a general constitutional requirement of *sua sponte* judicial hearings on competency for every defendant who raises a "mere claim of irresponsibility," cf. United States v. Currier, 405 F.2d 1039 (2 Cir.), cert. denied 395 U.S. 914, 89 S.Ct. 1761, 23 L.Ed.2d 228 (1969). But the trial court could have resolved many difficulties at the voluntariness hearing by inquiring into the loose ends clearly revealed by testimony concerning Silva's apparent suicide attempt only a week before his confession. Although investigation into the appellant's mental competence was abandoned by his Legal Aid counsel when it was learned that Silva had already gone to the hospital, no attempt was made by anyone involved to learn what, if anything, was done there. In addition, no attempt was made to investigate the diagnoses and treatments, if any, given Silva at named hospitals to which Silva had been committed [3] at the time of prior psychiatric disturbances. These facts were revealed to the trial judge at the hearing, and they went beyond "claims" of irresponsibility and might have had some bearing upon the voluntariness of the confession.

We believe that the extent to which mental competence must be investigated before a confession may be found voluntary is essentially a question for trial court discretion. See Green v. United States, *supra*. But in this case, in which the testimony clearly posed the question, we find that no investigation whatsoever was made. As an exercise of our power to supervise the administration of federal criminal justice, see United States v. Baird, 414 F.2d 700, 710 (2 Cir. 1969), we remand for a hearing *nunc pro tunc* upon the issue of Silva's mental competence to waive his rights and confess on January 17, 1968. The records of his stay at Bellevue, as well as records of his prior history of hospitalization, are presumably as available today as they were at the time of the original hearing and trial. See Jackson v. Denno, 378 U.S. 368, 393–395, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); Gladden v. Unsworth, *supra*.

The appellant also claims that he was denied effective counsel on the day of his confession because any assistance supplied by his Legal Aid attorney was "illusory." We find no substance to this contention, which is based largely on the lawyer's decision to allow Silva to proceed with his intention to confess despite some knowledge of the appellant's psychiatric background. The record indicates bargaining among Silva, his attorney, and the prosecutor over possible leniency in exchange for Silva's cooperation; and this comes within the area of an attorney's choice of tactics. Counsel's conduct was not such as "to shock the conscience of the Court and make the proceedings a farce and mockery of jus-

---

3. Silva stated he was an inmate at Kings Park State Hospital in October or November of 1965 and that he had been "to" the psychiatric division of Kings County Hospital seven or eight times, including one visit after a suicide attempt. In answer to the question, "How come you went to the hospital?," he answered: "The first time it was on my own, because I was hearing things and seeing things and felt somebody was, you know —I was seeing things."

He also stated that he had previously attempted suicide while imprisoned at Rikers Island.

While some of the details concerning these incidents may have been included in the presentence report upon the basis of which the sentencing judge decided that no further examination was necessary, they were never made known to the judge who passed upon the voluntariness of the confession.

tice." United States v. Currier, *supra* 405 F.2d at 1042–1043; United States v. Wight, 176 F.2d 376, 379 (2 Cir. 1949), cert. denied 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950); see United States ex rel. Maselli v. Reincke, 383 F.2d 129 (2d Cir. 1967).

Silva notes finally that at the end of his trial testimony, when he accused the Assistant U. S. Attorney of attempting to suborn his false testimony in another trial, the prosecutor flared: "I say right here and now you are a a liar." The appellant's counsel asked that the jury be instructed to disregard this remark and also moved for a mistrial, but the court simply replied: "The jury will decide those questions."

While the trial court's statement was somewhat terse and not very illuminating as an instruction to the jury, it apparently satisfied the appellant's counsel, who did not request a more complete instruction at the time. The prosecutor's retort did not suggest a reference to the defendant's testimony on the material issue of the case. Under the circumstances, failure to give further limiting instructions was not plain error.

Remanded for proceedings consistent with this opinion.