**Guenter H. SCHOELLER, Petitioner-Appellant,**

v.

**Walter DUNBAR, Director, California Department of Corrections, et al., Respondent-Appellees.**

**No. 23270.**

United States Court of Appeals, Ninth Circuit.

Feb. 24, 1970.

Frederick P. Furth (argued), San Francisco, Cal., for petitioner-appellant.

Jerome C. Utz (argued), Deputy Atty. Gen., Thomas C. Lynch, Atty. Gen., State of California, San Francisco, Cal., for respondent-appellees.

Before BARNES, HUFSTEDLER and KILKENNY, Circuit Judges.

KILKENNY, Circuit Judge.*

Appellant is critical of the judgment of the District Court denying his petition for a writ of habeas corpus.

In May, 1964, appellant was charged, by indictment, with violating Sections 187 (murder) and 217 (assault with a deadly weapon with intent to commit murder) of the California Penal Code. Appellant's privately retained counsel arranged for his examination by a private psychiatrist. After reviewing these findings, appellant and his counsel concluded that there was no insanity defense available and that appellant was mentally competent to understand the nature of the proceedings against him and to cooperate in his defense with counsel. Subsequent to the examination, appellant, with his counsel present, withdrew his previous plea of not guilty and entered a plea of guilty to violating Sec-

* District Judge for the District of Oregon at time of argument.

tion 187. In turn, the prosecution dismissed the Section 217 charge. At the same hearing, it was agreed that appellant was entering his guilty plea to a second, rather than a first, degree murder charge.

Subsequently, on the trial judge's own motion, and before sentence, a hearing was held on whether appellant's plea of guilty was voluntarily made and on whether he was suffering from mental incapacity. Appellant and his counsel appeared and stated in open court that the plea was not the result of any mental infirmity on the part of the appellant and that there was no basis, in fact, for an insanity plea or a hearing under Section 1368 of the Penal Code.[1] Nevertheless, to be abundantly certain of his position, the state trial judge placed appellant in Vacaville, a state institution, for diagnosis and recommendation under the provisions of Section 1203.03 of the Penal Code. On receipt of the report from this institution, and after another hearing,[2] the judge sentenced appellant to state prison for the term prescribed by law.

The only evidence in the record which would point toward the possibility of appellant's mental imbalance at the time he bargained for a dismissal of one count in the indictment and for a reduction from first degree to second degree murder in the other is that he had suicidal tendencies, exhibited signs of depression and, according to his attorney, was "medically ill in a medical sense, but 'competent to stand trial.'" There is nothing in the record to indicate that appellant, at the time of the entry of his plea of guilty, was unable to understand the nature of the charge against him or that he was unable to fully cooperate with his attorney. Without question, appellant, at the time of the entry of his plea, had the ability to consult with his lawyer with a reasonable degree of rational understanding and had a rational, as well as a factual, understanding of the nature of the proceedings against him. His "I don't care" attitude was clearly the result of a deep repentance resulting from the murder of his beloved and the shooting of another. The killing with which appellant was charged was the climax to an involved love affair. We do not believe it a strange reaction for a normal person to go into a depression and think of committing suicide when, in a jealous rage, he kills the girl he loves. Appellant, at the time of the killing, was a high school principal and working toward a Masters Degree in Comparative Literature. His tests at Vacaville, when compared with others there tested, revealed that he had an exceptionally high IQ. He was classified as one of "superior intelligence", and not suffering from "intellectual impairment." In this factual atmosphere, neither his suicidal tendencies, nor his depressions, could have caused him to be substantially unable to comprehend the nature of the charge or unable to cooperate with his attorney. On his return from Vacaville, the appellant would will-

---

1. "THE COURT: The only thing that concerns me is whether or not that original plea was acceptable from a legal viewpoint.

Do you, Mr. Berman,*—you are not [sic] longer his attorney, but you were then. Now, you have discussed this with me and you have advised me on more than one occasion previous to this time that the medical information that you had was such that there was no basis for a plea of not guilty by reason of insanity, is that so?

MR. BERMAN: That is correct.

If Your Honor please, both the medical records, which I examined from the County Hospital from his previous commitment back in the latter part of May and the early part of June, plus my own psychiatrist, Dr. Faircloth, both of them indicate that there was no basis whatsoever for an insanity plea. However, I did advise the Court that I felt the man was mentally ill in a medical sense.

DEFENDANT SCHOELLER: I do not accept this. I will under no circumstances plead insanity.

THE COURT: We understand this.

DEFENDANT SCHOELLER: And of course, I agree that certainly I was not insane. * * * "

* Appellant's retained attorney.

2. November 20, 1964.

ingly have accepted probation. For that matter, appellant's attorney, by lengthy argument, tried to convince the court that probation was proper.[3] From this footnote, it is crystal clear that the appellant and his attorney could probably have withdrawn the plea of guilty even as to the second degree charge as late as the final hearing. Appellant's dissertation at that time demonstrates a mental capacity equal to, if not above, the average human being.

We find nothing in Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), which even remotely suggests that the hearings held in the state court were not constitutionally adequate, nor does Rhay v. White, 385 F.2d 883 (9th Cir. 1967), suggest a contrary result. *Pate* presents a factual setting entirely foreign to the one before us. There, the respondent, who was convicted of murdering his common-law wife, had a long history of disturbed behavior, had been confined as a psychopathic patient and had committed acts of violence, including the killing of his infant son and an attempted suicide. Four defense witnesses testified that respondent was insane. The trial judge declined rebuttal medical testimony on respondent's sanity, deeming sufficient a stipulation that a doctor would testify that when respondent was examined a few months before trial, that he knew the nature of the charges and could cooperate with his counsel. The trial judge completely rejected respondent's claims of insanity. Here, the appellant took exactly the opposite position. Here, the appellant insisted that he was sane, insisting on changing his plea from not guilty to guilty, had no previous record of irrational conduct and produced no substantial evidence that he was possibly insane, incapable of understanding the nature of the charges against him, or assisting in his own defense. In *Pate*, the Court failed to grant respondent a hearing. 383 U.S. p. 385, 86 S.Ct. 836. The exact opposite is true in this case. Here, it could well be argued that the court was overly zealous of appellant's rights to competency hearings and, *sua sponte*, ordered appellant to Vacaville for observation and report. We ask

3.  *  *  *  *  *

"THE COURT: Does he want probation? I thought he wanted to be executed. Does he want probation?

MR. BERMAN: I certainly think he is eligible for probation.

THE COURT: Does he want it?

MR. BERMAN: Yes, Your Honor.

THE COURT: Well, he has changed his mind then.

DEFENDANT SCHOELLER: Your Honor, perhaps I may be allowed to say a few words to that, sir."

*  *  *  *  *

"DEFENDANT SCHOELLER: I would like to draw attention to something which happened while I was still in Vacaville earlier this week.

A newspaper report appeared in which it was reported in a deplorably distorted fashion of the facts that, indeed, I had been recommended for probation, but had countered this recommendation with a renewed appeal or desire to appeal to the Court for capital sentence.

This is completely in error. . . .

The statement in question was made many weeks ago and it was born out of a mental condition which I at this time can no longer even remotely describe as a sound one. It is not so bad that in colloquist [sic] speaking it has made me look like some sort of a nut, but the worse part of it is the people at Vacaville, the staff members at the Department of Corrections who have genuinely tried to help me and evaluate the stiuation, were also somewhat derisively treated in this article, and I would like to counter this with an expression of profound gratitude for what they have done. Specifically in terms of probation, if I should be granted probation I would accept it with profound gratitude and full cognizance of the responsibility it places upon me in terms of my obligation to justify the confidence thus demonstrated.

However, at the same time I am sober enough to realize that it is not merely a question of objective analysis of enlightened psychiatric facts and their interpretation, but also legal tradition and certain moral values.

Therefore, I must at this time be prepared for anything, although at the same time I do entertain a certain if modest amount of hope for something better."

*  *  *  *  *

what more could the court do under the existing circumstances? Appellant insisted that he had the required mental capacity and even refused to cooperate in many of the court's suggestions in connection with examinations.

We do not believe that *Pate* requires the district court, in every habeas corpus proceeding, to limit its inquiry to the record which might have been made in the state trial court. The majority in Pate thought it best to so limit the inquiry where the defendant had consistently claimed his insanity, and another hearing could not be held for over six years after the fact. We are not here faced with the six year problem. Appellant was sentenced on November 20, 1964. As early as March 9, 1965, he was seeking relief in the California State Court of Appeals under Rule 31(a) of the California Rules of Court. This relief was denied on June 2, 1965, after an evidentiary hearing. He then asked the California Supreme Court for a hearing, his petition being denied on July 8, 1965. Then, on May 4, 1967, he filed the present petition.

■ In our circumstances, a number of Ninth Circuit cases not only approve, but seem to require, the district judge to hold a hearing on the issue of the validity of the guilty plea. Jones v. United States, 384 F.2d 916 (9th Cir. 1967); Castro v. United States, 396 F.2d 345 (9th Cir. 1968); United States v. Tweedy, 419 F.2d 192 (9th Cir., 1969). Here, the appellant asked for and received a full blown evidentiary hearing in district court. He called his own witnesses and the state called theirs, including at least one of the original doctors, Mr. Berman, the appellant's original attorney, and the Superior Court judge who conducted the hearing. Appellant is in no position to now claim that the trial judge in district court should have limited the hearing to the transcript of the proceedings occurring in state court. In any event, the district judge followed the procedure outlined in *Jones, Castro* and other cases.

■ The district court, in its evidentiary hearing, thoroughly explored the state court's proceedings. In his comprehensive decision, consisting of thirteen typewritten pages, he clearly enunciates the evidentiary facts, as well as the controlling decisional and statutory law. It would serve no useful purpose to further elaborate on his definitive findings and solid conclusions. Beyond question, they are not clearly erroneous. Aside from that, our independent examination of the state court record convinces us that the appellant had the required mental capacity at the time he entered his plea of guilty and at the time he was sentenced.

We affirm for the reasons stated in the decision, findings and conclusions of the trial judge and on our own analysis of the state court record.

BARNES, Circuit Judge, concurs.

HUFSTEDLER, Circuit Judge (dissenting).

I respectfully dissent.

The failure of the state trial court to order an evidentiary hearing to determine appellant's competency to stand trial and its acceptance of his plea of guilty when there was substantial evidence of appellant's incompetency were a denial of due process of law requiring the writ to issue, unless the state court vacates the sentence and permits appellant to withdraw his guilty plea.

The record reveals the following facts. On April 24, 1964, appellant shot and killed his girl friend and shot and wounded her landlady. The shooting fray occurred during a quarrel between appellant and the decedent after she had rejected his marriage proposal. The landlady intervened during the quarrel and threatened to call the police to eject the appellant. He shot her, then turned upon the decedent and shot her twice. Appellant surrendered to the police later in the day.

Appellant, represented by the public defender, was arraigned on May 15,

1964, on charges of first degree murder and assault with a deadly weapon with intent to commit murder. He pleaded not guilty to both charges, but the public defender indicated that the plea might later be changed to not guilty by reason of insanity.

On May 29, 1964, the physician at the County Jail certified appellant to the Detention Ward of the San Francisco County General Hospital for diagnosis and treatment. The jail physician diagnosed appellant as then "suffering from suicidal tendencies." Appellant was observed, interviewed, and diagnosed by several medical examiners while he was in the hospital. The examiners submitted reports, at least the first two of which were part of the record before the state trial court, each dated June 4, 1964. The first report, signed by two examiners, said, in part: "Threatens to kill self if he is not given death sentence. Had thought of suicide for some weeks prior to his offense. * * * Decided to make one more effort to get her to come back * * * [and] if she wouldn't he would kill himself. * * * She jilted him again—and he doesn't remember what happened next but evidently he killed her instead." The report ended: "Not presently psychotic, but potential suicide risk." Another report by a different doctor recited that doctor's observations and concluded with his impression: "Depression with suicidal tendencies? possible schiz." A third report said, in part: "Vague & secretive about murder & reasons, seems schizoid & depressed, don't know if psychotic or not underneath, mild, not cooperative enough with exam & no history available."

On August 24, 1964, appellant appeared for trial with a private lawyer, Mr. Jack Berman, who had been retained for appellant by his sister. The proceeding that followed was brief and perfunctory. Mr. Berman told the court that he had discussed the matter with the appellant, the district attorney, and the court, and that "we are prepared to make a motion to withdraw the former plea of not guilty for the purpose of entering a different plea to Count 1." The clerk read the charges from the indictment and asked appellant how he would plead. He responded "guilty," the only word he spoke during the proceeding. No other questions were put to him. The attorneys stipulated that the plea was to second degree murder, appellant's motion to withdraw his plea was granted, and the prosecuting attorney's motion to dismiss the second count was granted. The court thereupon issued an order recommending appellant's referral to Vacaville medical facility for 90 days for the purpose of obtaining that facility's recommendations for the institutional disposition of appellant. The court deferred sentencing until Vacaville had acted upon the court's requested reference, and ordered appellant returned to the County Jail. Four days later the jail physician again committed him to the hospital upon his diagnosis that appellant was suffering from "suicidal tendencies" and was "a definite Suicidal risk." He was reexamined at the hospital. The report of the examiner concluded with the diagnosis "Reactive depression in obsessive-compulsive personality" with the recommendation that he be institutionalized.

From the hospital on November 4, 1964, appellant wrote to the trial judge. He told the court he wanted to discharge Mr. Berman, and he wanted to represent himself. He offered to plead guilty to first degree murder, "contingent upon the imposition of the death sentence." He said that he refused to undergo any more medical examinations. On the same day, Mr. Berman appeared in court and recited that he had been informed that Vacaville had agreed to accept appellant. The deputy district attorney requested that appellant be brought down on the 8th of September for removal to Vacaville "just because he is so dangerous to himself."

On September 8, 1964, appellant again appeared in court. He insisted that there be a "final disposition of my case," and he renewed his offer to plead

guilty to first degree murder. He repeated his wish to discharge Mr. Berman and to represent himself. He volunteered to the court that his reasons for "entering a guilty plea are not due to the fact that I am suffering from a 'guilt complex' or a psychotic desire to be punished. * * * [A]s far as the crime itself is concerned I do not feel any criminal responsibilities since it was an act which was beyond anything I ever intended or consciously did. The reasons for my entering such a plea are of a, let's call it personal, philosophical nature which I do not wish to disclose, and I believe that is about all, and if now Your Honor would please sentence me and get this matter over with." He added, "[A]s far as I am concerned I have reached a point in my life at which continuance of my life is no longer desirable and necessary or in any way * * * possible, logically, emotionally and intellectually." Sentencing, he said, was meaningless and "nothing will prevent me from taking my life when I find a suitable opportunity."

After listening to those and to similar statements of appellant, the court remarked: "The only thing that concerns me is whether or not that original plea was acceptable from a legal viewpoint." At this juncture the court turned to Mr. Berman and said: "Now, you have discussed this with me and you have advised me on more than one occasion previous to this time that the medical information that you had was such that there was no basis for a plea of not guilty by reason of insanity, is that so?" [None of the discussions to which the court alluded were reported, and the record provides no clue to the circumstances under which they took place.] Mr. Berman replied affirmatively, and then added: "[B]oth the medical records, which I examined from the County Hospital from his previous commitment back in the latter part of May and the early part of June, plus my own psychiatrist, Dr. Faircloth, both of them indicate that there was no basis whatsoever for an insanity plea. However, I did advise the

Court that I felt the man was mentally ill in a medical sense. * * * I feel as a lawyer that the plea was properly entered in terms of the man's competence in a 1368 proceeding. He understood what he was doing. * * * I think certainly that the commitment and the studies made there [Vacaville medical facility] would indicate whether the legal opinion I have, which is not based on any personal medical knowledge, but on hearsay that I have gathered from the psychiatrists, would confirm whether I am right in saying that the man was fully cognizant of his actions under the provisions of 1368." The court thereupon committed appellant to the California Medical Facility at Vacaville.

Following his confinement, observation, and treatment at Vacaville, the examiners submitted a detailed report about appellant's condition, including the following observations: "The amnesia that he claims for the event [murder] is probably quite valid and is characteristic of so-called 'dissociative reactions' in which repressed impulses and anxiety is [sic] discharged or deflected into a symptomatic expression which consists of a blotting out of awareness of unpleasant or intolerable realities. This was followed by a period of intense depression and morbid preoccupation with guilt feelings which could only, in his opinion, be atoned for by eliminating himself. The acute phase of this disorder is now past. * * * It must be recognized, however, that he still has an underlying emotional disturbance of considerable magnitude and that if he is to accomplish anything with his life he requires intensive psychiatric treatment." The doctor recommended probation, "provided he obtains intensive psychiatric treatment. * * *"

On November 20, 1964, appellant was returned for sentencing. The trial court sentenced him to state prison for the term prescribed by law for second degree murder.

After appellant had exhausted all of his state postconviction remedies, he filed his habeas petition in the District

Court. He was examined by another psychiatrist, Dr. Blinder, shortly before the federal hearing. Upon the basis of his examination of appellant and his review of the record of the 1964 criminal proceedings, together with the hospital and medical reports, Dr. Blinder testified that in his opinion the appellant was mentally incompetent at the time the plea was entered. The notes which Mr. Berman had made after Dr. Faircloth had examined appellant in early August 1964 were introduced. The notes were: "Faircloth results. No psych. defense—Very disturbed. Poss. quite crazy. Hyper-rational man. Consid. suicide potential. Might kill someone else. Does have some awareness of fact he might kill again. Superior man. Can't know what is going on in his head. Doesn't know if psychotic or not. Very disturbed. Diff. to exam. 90 day Vacaville—" [Periods added.]

The District Court, in denying the petition, said: "While petitioner expressed his desire to be sentenced to capital punishment for his crime, attempted suicide several times, and was considered extremely depressed and mentally ill by all who observed him, these facts were not such as to present a substantial doubt as to petitioner's competency to proceed when at the same time petitioner was acting rationally, speaking lucidly, a psychiatric report from San Francisco County Hospital described him as 'presently sane (but depressed),' [exhibit references omitted] Mr. Berman had indicated to the sentencing judge the fact that petitioner had been examined by a psychiatrist and that from both the psychiatrist's and Mr. Berman's points of view there was no problem with petitioner's competency to proceed, and the petitioner himself was vigorously protesting any suggestion that he was incompetent.

The District Court's conclusion that the failure of the state trial court to order an evidentiary hearing on the issue of defendant's capacity to stand trial was not a violation of due process rests on assumptions of law that are contrary to the controlling principles of law stated in Pate v. Robinson (1966) 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 and Rhay v. White (9th Cir. 1967) 385 F.2d 883.

Those principles can be summarized as follows: An evidentiary hearing on the issue of a criminal defendant's competency to stand trial is constitutionally compelled at any time during his trial in which there appears "substantial evidence" that the defendant is incompetent. Such "evidence" is not confined to testimony or exhibits formally introduced at the trial. It includes all information properly before the court indicating a defendant's mental illness, including, for example, the trial court's observations of the defendant's demeanor and conduct, medical reports contained in defendant's file, and reports of probation officers. In determining the substantiality of evidence of incompetence for the purpose of triggering a competency hearing, the trial court must disregard any evidence tending to prove competency and must assume the truth of the evidence indicating incompetency. The trial court cannot weigh the evidence, determine credibility of witnesses, nor resolve conflicts in the evidence until the evidentiary hearing on the competency issue has concluded.[1]

In *Pate* the United States Supreme Court overturned an Illinois murder conviction because the state trial court failed *sua sponte* to hold an evidentiary hearing on the issue of Robinson's competency to stand trial. The evidence of incompetency was introduced at Robinson's murder trial primarily for the purpose of supporting Robinson's insanity defense. Some of Robinson's relatives and a family friend testified to his erratic conduct several years before trial. His mother stated her opinion that he was presently insane. There was introduced a record of a mental hospital to which he had been committed and from

---

1. People v. Pennington (1967) 66 Cal.2d 508, 58 Cal.Rptr. 374, 426 P.2d 942.

which he had been released as restored some seven years before trial. As against this evidence of incompetency, there was introduced a stipulation between Robinson's lawyer and the prosecuting attorney that a named doctor, if called as a witness at trial, would testify that in his opinion Robinson "knew the nature of the charges against him and was able to cooperate with counsel when he examined him two or three months before trial." (383 U.S. at 383, 86 S.Ct. at 841.) As revealed by the trial court record, Robinson participated actively and alertly in the conduct of his trial. The Illinois Supreme Court, affirming the conviction, held that the trial court was not compelled on its motion to order a hearing on Robinson's capacity to stand trial, because the evidence did not raise sufficient doubt about his then competence. Thereafter a federal district court denied Robinson's habeas petition without an evidentiary hearing. The Court of Appeals reversed, and the cause came before the Supreme Court on certiorari. The Court agreed with the Court of Appeals that the failure of the trial court to order a sanity hearing was a deprivation of due process. No evidentiary hearing in the federal court was required because the state trial record on its face disclosed enough evidence to have compelled the trial court to interrupt the homicidal trial for a hearing on his then competency to stand trial. Robinson's rational behavior during the trial and the stipulation that the examining psychiatrist would testify that Robinson was sane enough to be tried could not be relied upon to excuse the trial court's failure to order a competency hearing.

Thus, *Pate* teaches that the role of the federal habeas court is limited to an examination of the proceedings before the trial court upon the trial of the offense for which the defendant was convicted. If substantial evidence of incompetency to stand trial appears on the face of that trial record, there is no need for an evidentiary hearing. There are no facts for a federal habeas court to find, because the question is not: Was the defendant then competent? The question is: Was there substantial evidence in the record before the trial court that the defendant was then incompetent? That question is a question of law to be decided solely from the record before the trial court. In determining that question, the federal habeas court cannot weigh the evidence of competency against the evidence of incompetency to find support for the trial court's failure to order a competency hearing.

However, when there was evidence of incompetency presented to a trial court that was not made a part of the trial court record, an evidentiary hearing is necessary to reconstruct the record. This is the situation in Rhay v. White (9th Cir. 1967) 385 F.2d 883. On the face of the record of White's trial there were hints that he was incompetent to stand trial. But much of the information before the trial court relating to the issue was not in the record.[2] The missing items consisted of the trial court's personal observations of White's erratic behavior and of off-the-record discussions between White's counsel and the trial court. An evidentiary hearing was held on White's federal habeas petition for the purpose of ascertaining the full record before the trial court. In the *Rhay* situation the federal court was required to find facts, but the factual findings were limited to a determination of what happened during White's trial. Once those facts were found, the federal habeas court was presented with the identical question of law stated in *Pate*.[3]

**2.** "[T]he situation here was in any event one, as in Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824, where elements were involved that were beyond the information of the trial record, as the hearing held by the District Court clearly demonstrates." 385 F.2d at 884.

**3.** Brizendine v. Swenson (W.D.Mo.1969) 302 F.Supp. 1011, is illustrative of the proper role of a federal habeas court.

In both *Pate* and *Rhay* a court reviewing the decision of the federal habeas court is not bound by the lower court's conclusion upon the ultimate issue of law, but in the *Rhay* situation, it is bound by the usual intendments indulged in favor of the factual findings of the lower court.

The *Pate* and *Rhay* cases are to be distinguished from a case in which, on collateral attack, a defendant contends that he was in fact incompetent to stand trial, but no substantial evidence of his incompetency was presented to the trial court. (*E. g.,* Smith v. United States (9th Cir. 1959) 267 F.2d 210; Robinson v. Johnston (9th Cir. 1941) 118 F.2d 998, 1001, vacated and remanded on other grounds (1942) 316 U.S. 649, 62 S.Ct. 1301, 86 L.Ed. 1732, rev'd on other grounds (9th Cir. 1942) 130 F.2d 202; Sanders v. Allen (1938) 69 App.D.C. 307, 100 F.2d 717.) Under the latter circumstance, the function of the court conducting the proceeding on collateral attack is to decide the fact of competency or incompetency. That function could rarely, if ever, be performed without an evidentiary hearing. The petitioner in such a case bears the burden of proving the fact of incompetency to stand trial. (*See* Butler v. United States (8th Cir. 1967) 384 F.2d 522, cert. denied (1968) 391 U.S. 952, 88 S. Ct. 1854, 20 L.Ed.2d 865.)

The record of the state trial court in the case at bench contains substantial evidence that appellant was incompetent to stand trial. This is a *Pate* case, rather than a *Rhay*, or competency-in-fact case. Indeed, the evidence of this appellant's mental incapacity is far stronger than was the evidence in *Pate*. The trial record includes medical reports that appellant was suicidal, severely depressed, and possibly schizophrenic. Added to the medical data was appellant's own conduct—his repeated insistence upon being put to death, his threats to kill himself if he were not executed, and his admission that he had no memory of the shooting.[4] Ability to coop-

---

There, the state trial court had ordered a psychiatric examination to determine the defendant's competency to stand trial for murder. Under the applicable state law, such an order had to be based on a finding that there was "reasonable cause" to believe that the defendant was incompetent. An examination was held, and, satisfied by the doctor's report, the trial judge decided that no hearing was required and that trial could proceed. A conviction resulted. The district court issued a writ of habeas corpus, holding that the trial court's order of an examination created alone a *bona fide* doubt of incompetency under *Pate*.

"In such a case there is no occasion whatever for an appellate court or for a postconviction court to make any inquiry into whether the evidence adduced at trial did or did not corroborate the trial judge's definitive judicial determination of *bona fide* doubt. The *bona fide* doubt criteria of Pate v. Robinson need be established only once, not twice, in the application of the principles of that case." (302 F.Supp. at 1019.)

The court indicated the proper scope of a postconviction court's inquiry when a psychiatric examination was not ordered:

"to study the trial record, or to consider other evidence, in order to determine whether the defendant's history and actions before, during, or after the trial, should have raised a *bona fide* doubt of his competency to stand trial." (302 F.Supp. at 1019.)

*Accord,* United States ex rel. Cole v. Follette (S.D.N.Y.1969) 301 F.Supp. 1137, 1149.

4. *Compare* United States v. Silva (2d Cir. 1969) 418 F.2d 328. Silva had informed an F.B.I. agent at the time of his arrest for bank robbery that he would commit suicide rather than stand trial. A few days after his arrival at the Federal House of Detention, he had swallowed several articles of a possibly dangerous character. He was then taken to the prison ward of the psychiatric division at Bellevue Hospital, where X rays were taken and he received some undisclosed treatment. No determination was made there of his mental condition. A few days later he was returned to the House of Detention, where he subsequently made a confession. At a hearing to determine the voluntariness of the confession, the defendant denied making the confession "and also testified that

erate with one's lawyer and to assist in one's defense requires more than an ability to express coherently a determination to be put to death. (Dusky v. United States (1960) 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824; *cf.* Rees v. Peyton (1966) 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583; Westbrook v. Arizona (1966) 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429.)

The majority opinion attempts to excuse the patent constitutional error in several ways, none of which withstands critical examination.

First, the majority opinion implies that appellant was accorded an evidentiary hearing on September 8th, when it states: "on the trial judge's own motion, and before sentence, a hearing was held on whether appellant's plea of guilty was voluntarily made and on whether he was suffering from mental incapacity." That statement is contradicted by the record in the following particulars: (1) the proceeding was not conducted on the court's own motion, (2) it was not directed to appellant's competency, and (3) it was not an evidentiary hearing. The record shows that the proceeding on September 8 was held in response to either one or both of two events: the request of appellant to change his plea to guilty of murder in the *first* degree "contingent upon the

imposition of the death sentence," or requests by both the deputy district attorney and appellant's dismissed counsel to remove appellant to Vacaville. The "hearing" was not for the purpose of inquiring into appellant's competency; rather, the competency question arose when appellant, then representing himself, explained that he had not pleaded guilty because he thought he had any criminal responsibility in that "it was an act which was beyond anything I ever intended or consciously did," but he had pleaded guilty for "personal, philosophical" reasons that he did not wish to disclose. The court then expressed doubt that it should have taken his earlier plea. No evidence of any kind was taken on the competency question at that proceeding. It cannot conceivably be characterized as a hearing complying with the requirements of *Pate*.

Second, the majority emphasizes the trial judge's referring appellant to the Vacaville diagnostic facility for 90 days pursuant to California Penal Code § 1203.03. The implication is that that referral in some way eliminates the need for a *Pate* evidentiary hearing. I reject the implication. Referral under § 1203.03 is a *post*conviction action under California law, for the purpose of aiding the trial court in determining the disposition of a convicted offender.[5] The

he had previously undergone treatment at various hospitals for psychiatric disorders, that he had told the prosecutor about having hallucinatory visions, his use of heroin prior to his arrest, and several attempts to commit suicide." (418 F.2d at 329–330.) The district judge found the confession was voluntary. Silva was convicted. The Second Circuit reversed:

"Even though Silva's mental competence was never placed directly in issue, the testimony concerning the circumstances of his confession was such that the trial judge should have ordered a hearing *sua sponte* on the narrow issue of his capacity to make it. See Westbrook v. Arizona [(1966) 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429], Pate v. Robinson, *supra*." (418 F.2d at 330–331.)

5. In pertinent part § 1203.03 provides:

"(a) In any case in which a defendant is convicted of an offense punishable by imprisonment in the state prison, the court, if it concludes that a just disposition of the case requires such diagnosis and treatment services as can be provided at a diagnostic facility of the Department of Corrections, may order that defendant be placed temporarily in such facility for a period not to exceed 90 days, with the further provision in such order that the Director of the Department of Corrections report to the court his diagnosis and recommendations concerning the defendant within the 90-day period.

"(b) The Director of the Department of Corrections shall, within the 90 days, cause defendant to be observed and examined and shall forward to the court

majority states that the trial judge made the referral "to be abundantly certain of his position [concerning appellant's competency]." But there is nothing in the record to suggest that that was the purpose of the referral, and, indeed, a finding by the district court is to the contrary.[6] Nor did the doctors at Vacaville address themselves to the question of appellant's competency to stand trial (as their report, *supra*, clearly shows), and we have no indication that the trial court asked them to consider this question. The report issued by Vacaville cast considerable doubt on appellant's competency both during August and September and at the time of his November appearance for sentencing. That final appearance before the trial court was in no sense a hearing, evidentiary or otherwise, on the issue of his competency to be tried or his competency to enter a plea of guilty. It was an appearance for sentencing only. There is no indication, either in the majority's footnote 3 or elsewhere, that appellant was free to withdraw his plea at that time. And there was substantial evidence that he was incompetent to do so, for the Vacaville report stated that appellant "still has an underlying emotional disturbance of considerable magnitude" and requires "intensive psychiatric treatment."

Third, the majority opinion makes some point of its characterization of appellant's guilty plea as the product of a plea bargain. The majority opinion fails to explain how the existence of a plea bargain is in any respect responsive to the constitutional issue presented, and I am unable to supply any explanation. Moreover, the record does not support the majority's statement insofar as it suggests that the appellant himself participated in or yielded to a plea bargain. There is some indication that appellant's former counsel participated in a plea bargain, the details of which were never revealed in the record, but there is nothing in the record to support the statement that appellant himself participated in that bargain, if any there were. To the extent that appellant's participation appears from the record, the indication is that he opposed the plea entered on his behalf.

Finally, the majority refers to the conflicting evidence on the issue of appellant's competency and concludes that the conflicts were resolved against him by the state trial court and in postconviction proceedings. The state court did not purport to resolve the conflicts in the evidence at the time appellant was tried, or when his plea was taken, or when he was sentenced. Were there an implied finding of competency, that finding would constitutionally fail by reason of the lack of any evidentiary hearing compelled by *Pate*. The constitutional error cannot be cured by appellant's failure to persuade the district court on collateral attack that he was in fact incompetent to stand trial. It cannot be cured by reference to "the curb-

---

his diagnosis and recommendation concerning the disposition of defendant's case. Such diagnosis and recommendation shall be embodied in a written report and copies of the report shall be served only upon the defendant or his counsel, the probation officer, and the prosecuting attorney by the court receiving such report. After delivery of the copies of the report, the information contained therein shall not be disclosed to anyone else without the consent of the defendant. After disposition of the case, all copies of the report, except the one delivered to the defendant or his counsel, shall be filed in a sealed file and shall be available thereafter only to the defendant or his counsel, the prosecuting attorney, the court, the probation officer, or the Department of Corrections."

6. "This section [§ 1203.03] is intended primarily as a sentencing aid in cases where probation is a possibility. However, in this case even though the trial judge had no intention of granting probation, he felt that the facilities for treatment at Vacaville were superior to those at regular penal institutions and that some good preliminary treatment and diagnosis would aid petitioner's adjustment to penitentiary life and start him on an earlier road to recovery."

stone views of a dismissed (and evidently long-suffering) defense lawyer" (United States ex rel. Cole v. Follette, *supra*, 301 F.Supp. at 1149), or by a judicial diagnosis years after the event that appellant's multiple suicide attempts and the psychiatric evaluations that he was suffering from psychotic depression evidenced merely normal "deep repentence" for homicide.

The failure to order a hearing on the issue of appellant's competency to stand trial is not the only constitutional defect in the state proceeding. The second defect, as glaring as the first, is the acceptance of appellant's guilty plea under the facts shown in this record.[7]

At the time the guilty plea was initially taken, the court had before it substantial evidence that appellant was suffering from mental illness and had strong suicidal tendencies; this evidence was amplified by the time of the hearing on September 8, 1964. Nevertheless, the court accepted the plea without first holding an evidentiary hearing on competency. The standards measuring a defendant's competency to stand trial are not necessarily identical to those defining his competency to enter a plea of guilty. (*Compare* Dusky v. United States (1960) 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824, *with* Kercheval v. United States (1927) 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009; *see* Westbrook v. Arizona (1966) 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429.) To the extent that they differ, the standards of competency to plead guilty are higher than those of competency to stand trial. A defendant is not competent to plead guilty if mental illness has substantially impaired his ability to make a reasoned choice among the alternatives presented to him and to understand the nature of the consequences of his plea. (*Cf.* Kercheval v. United States, *supra;* Rees v. Peyton, *supra,* 384 U.S. 312, 86 S.Ct. 1505.) Because there was strong evidence that appellant fell short of

these standards to enter a voluntary and understanding plea, acceptance of the plea was a violation of due process. (*E. g.,* United States ex rel. Crosby v. Brierley (3d Cir. 1968) 404 F.2d 790.)

I would reverse the order denying appellant's petition for a writ of habeas corpus with directions to issue the writ, unless the state court entered an order setting aside appellant's guilty plea and according the appellant an opportunity for trial not later than 60 days after our mandate goes down.

**7.** Unlike Boykin v. Alabama (1969) 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274, the record here is not silent on the issue of competency. We therefore need not reach the question of *Boykin's* retroactivity.