Kenneth SAILER, Petitioner,

v.

Jacob B. GUNN, Warden,
Respondent.

Civ. No. 71–1332–F.

United States District Court,
C. D. California.

Dec. 16, 1974.

Michael Brennan, Deputy Federal Public Defender, Los Angeles, Cal., for petitioner.

Evelle J. Younger, Atty. Gen. of Cal., Jack R. Winkler, Chief Asst. Atty. Gen., Crim. Div., S. Clark Moore, Asst. Atty. Gen., Russell Iungerich, Shunji Asari, Deputy Attys. Gen., Los Angeles, Cal., for respondent.

## OPINION

FERGUSON, District Judge.

Kenneth Sailer has petitioned this court for a writ of habeas corpus, based on numerous alleged violations of constitutional rights. Three of the claims raised by petitioner warrant granting the relief; it is therefore not necessary to reach the other contentions.

### Facts

1. Sailer was charged on August 24, 1965, with assault with a deadly weapon with intent to commit murder. The charge was based on an alleged shooting of his wife. On October 4, 1965, he pleaded guilty to the lesser included offense of assault with a deadly weapon. The prosecutor took the plea in the following manner:

"MR. REICHMANN: Kenneth Sailer, is that your true name?

THE DEFENDANT: Yes, sir.

MR. REICHMANN: Information 308 727 charges you with a violation of Section 217 of the Penal Code, assault with a deadly weapon with intent to commit murder; however, included within that offense is another felony, that of assault with a deadly weapon in violation of Section 245 of the Penal Code.

Your lawyer has indicated to me that you desire at this time to plead guilty to the included charge of assault with a deadly weapon in violation of Section 245 of the Penal Code. Is that what you want to do?

THE DEFENDANT: Yes, sir.

MR. REICHMANN: You want to plead guilty to this included charge of assault with a deadly weapon because you feel that you are guilty of that included charge?

THE DEFENDANT: Yes.

MR. REICHMANN: Has anybody made any promises to you such as probation or leniency or anything like that in return for the plea?

THE DEFENDANT: No.

MR. REICHMANN: You understand that whatever sentence you may or may not receive rests in the hands of Judge Holland or perhaps some other Judge of the Superior Court?

THE DEFENDANT: Yes, I do.

MR. REICHMANN: To the included offense of violation of Section 245 of the Penal Code, assault with a deadly weapon, how do you plead at this time? Guilty or not guilty?

THE DEFENDANT: Guilty."

Sentencing was set for October 29.

2. On that date, the court said that it had read and considered the probation report, and was ready to fix sentence or probation. Defense counsel said that given the circumstances of the case and the probation report, he felt that an evaluation of the defendant should be made in a state diagnostic facility, pursuant to § 1203.03 of the Penal Code.[1] The court said it was willing to have such an evaluation made if the Director of Corrections concluded that defendant was eligible and that facilities were available. The matter was continued till November 12, and then till November 19, at which time defendant was committed to the Department of Corrections for a § 1203.03 diagnosis.

3. At sentencing the court and counsel had before them a probation report dated October 21, 1965. In the report, Sailer is quoted as having said:

"My mind was mixed up at these times. . . . I would also like any help from this court I can get. I would also like to see a doctor myself, if appointed by the court or when I am released. I still love my wife and kids and the shock of actually shooting her convinced me I need help."

Sailer's brother was quoted as saying that Sailer was like a stranger, with his thinking and nerves in a very bad state. He, too, mentioned the desirability of medical help.

4. In his evaluation, the probation officer himself said:

"At this point, the defendant does not have the capacity to control his actions and to choose between alternative courses of behavior. . . . The one ray of hope is that the defendant did turn himself in and perhaps he himself is cognizant of the fact that he cannot control his hostilities and does need help. It is felt the

---

1. The pertinent parts of § 1203.03 state:

(a) In any case in which a defendant is convicted of an offense punishable by imprisonment in the state prison, the court, if it concludes that a just disposition of the case requires such diagnosis and treatment services as can be provided at a diagnostic facility of the Department of Corrections, may order that defendant be placed temporarily in such facility for a period not to exceed 90 days, with the further provision in such order that the Director of the Department of Corrections report to the court his diagnosis and recommendations concerning the defendant within the 90-day period.

(b) The Director of the Department of Corrections shall, within the 90 days, cause defendant to be observed and examined and shall forward to the court his diagnosis and recommendation concerning the disposition of defendant's case. Such diagnosis and recommendation shall be embodied in a written report and copies of the report shall be served only upon the defendant or his counsel, the probation officer, and the prosecuting attorney by the court receiving such report. After delivery of the copies of the report, the information contained therein shall not be disclosed to anyone else without the consent of the defendant. After disposition of the case, all copies of the report, except the one delivered to the defendant or his counsel, shall be filed in a sealed file and shall be available thereafter only to the defendant or his counsel, the prosecuting attorney, the court, the probation officer, or the Department of Corrections.

defendant should be removed from the community and perhaps the facilities at Vacaville could meet the defendant's needs at this point. . . . "

5. On March 18, 1966, court was convened to consider the § 1203.03 report, and to fix sentence. The summary recommendation sheet signed by the Associate Superintendent of the Reception Guidance Center recommended commitment to the Department of Corrections. In the statement of reasons, it was said that:

"Psychiatrically, prognosis was considered guarded in that subject acts impulsively with little consideration for the consequences of his actions. . . . "

Most of the individual evaluations underlying this recommendation were more specific in pointing to mental instability.

6. The Social Evaluation dated December 20, 1965, referred to accusations made by Sailer against his parents, and said:

"His accusations toward them are unfounded and characteristic of a bizarre character trait exhibited throughout the interview."

It also mentions his "tendency to act irrationally and impulsively . . . . "

7. The Psychological Report dated December 10, 1965, found Sailer to have a "paranoid orientation," and summarized in its "Diagnostic Impression" by saying "Personality pattern disturbance, paranoid personality."

8. The Psychiatric Report dated January 11, 1966, came to a different conclusion:

"He is not particularly anxious or depressed and shows no other significant psychoneurotic phenomena. . . . "

It did go on, however, to say that:

"He appears to be a rather impulse-ridden character who acts out impulsively and has extreme difficulty in handling hostility appropriately."

9. With these reports in hand, the court suspended the proceedings without imposing sentence, and placed Sailer on supervised probation for five years with certain conditions, one of which was that he be confined in a county jail for one year. The court recommended that this be a work camp or honor farm.

10. On September 13, 1966, Sailer was back in court on the basis of his probation officer's report that he had escaped from the honor farm on June 2, voluntarily turned himself in on July 11, 1966, and admitted to the officer that he had escaped. His attorney indirectly confirmed the escape. The court mentioned an Information charging escape, and an agreement to drop that charge if probation were revoked and Sailer sentenced to state prison. The court then said:

"In view of the defendant's violation of his probation here, the Court feels the sentence should be imposed in this case, probation revoked. I do not know whether probation has been revoked yet or not, but in any event, if it has not been revoked his probation is now revoked."

11. The probation report on which the court relied in revoking probation was dated July 22, 1966. In it, the officer reports that defendant's mother believes that he needs mental help. The report goes on to say:

"The defendant very readily speaks of other people as being insane in his opinion. In reality it is the opinion of his probation officer that the defendant is the one that is really sick. . . . "

The report goes on to recommend that probation be revoked.

12. Defense counsel was ready to waive further arraignment, but said that Sailer had something to say. Sailer then spoke for the first time in this proceeding, saying that while on the farm he had been unable to pursue his fight for a new trial, and that he had escaped in order to try to get money to do so.

13. Defense counsel then mentioned that on the date of the original sentencing (March 18, 1966) Sailer had wanted

to withdraw his guilty plea. The record is unclear, but it appears that Sailer's counsel had refused to make the necessary motion since the plea had been entered with the advice and counsel of another attorney. Counsel went on to say that he saw no legal basis for allowing withdrawal of the plea.

14. The court made reference to the absence from the record of any motions to withdraw the plea. It went on to say that:

> "The Court is of the opinion it has no jurisdiction to entertain either a motion for a new trial or a motion to withdraw the plea of guilty. Even if there was jurisdiction to entertain either of the motions, the Court, being thoroughly familiar with defendant's background and facts and circumstances of the crime committed, would deny either one or both of such motions."

15. The court sentenced Sailer to state prison for the prescribed term, saying:

> "It will be the strong recommendation of this Court that the Director of Corrections place this man in the California Medical Facility at Vacaville. I think this defendant is in need of psychotherapy and that that is the facility that can best help and treat him for any mental or emotional problems that he may have, and it appears from the report of the Director of Corrections, pursuant to Section 1203.03, that the defendant is in need of such therapy."

16. All of the court proceedings described above were conducted by the same judge.

17. Sailer has pursued his state post-conviction remedies, and is now properly before this court.

### Sailer's Competence

As the facts stated above indicate, the record is replete with evidence which raised doubts about Sailer's mental stability and capacity. The court at various times heard a request for a § 1203.-03 observation; read a § 1203.03 report full of comments about Sailer's paranoia and instability; and made a statement suggesting that psychotherapy was in order for the defendant. Yet at no time did the court hold a hearing on Sailer's competence to stand trial, or to plead guilty, or to participate intelligently in a sentencing (or probation revocation) proceeding.

In a case fairly analogous to this one, Moore v. United States, 464 F.2d 663 (9th Cir. 1972), the trial court had had before it a psychiatrist's report which detailed an extensive history of hospitalization for psychiatric problems and suicide attempts. It also reported that defendant's mental condition was unstable, and that he tended to engage in impulsive acting out which was often self-destructive. Nonetheless, the psychiatrist somehow concluded that the defendant was competent to stand trial. See 464 F.2d at 665. The court also had before it a Bureau of Prisons report which contained lengthy psychiatric reports about the defendant and his rather severe mental problems. 464 F.2d at 666.

In spite of all this information, the trial court held no competency hearing. The Ninth Circuit said:

> "Under the rule of Pate v. Robinson (1966) 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815, a due process evidentiary hearing is constitutionally compelled at any time that there is 'substantial evidence' that the defendant may be mentally incompetent to stand trial. 'Substantial evidence' is a term of art. 'Evidence' encompasses all information properly before the court, whether it is in the form of testimony or exhibits formally admitted or it is in the form of medical reports or other kinds of reports that have been filed with the court. Evidence is 'substantial' if it raises a reasonable doubt about the defendant's competency to stand trial. Once there is such evidence from any source, there is a doubt that cannot be dispelled by resort to conflicting evidence. The function of the trial court in applying

*Pate's* substantial evidence test is not to determine the ultimate issue: Is the defendant competent to stand trial? It [sic] sole function is to decide whether there is evidence which, assuming its truth, raises a reasonable doubt about the defendant's competency. At any time that such evidence appears, the trial court *sua sponte* must order an evidentiary hearing on the competency issue. It is only after the evidentiary hearing, applying the usual rules appropriate to trial, that the court decides the issue of competency of the defendant to stand trial." 464 F.2d at 666.

The Ninth Circuit has recently reaffirmed, by direct citation, these specific standards as governing the decision on whether a competency hearing is required. de Kaplany v. McCarthy, 503 F.2d 1041 (9th Cir. 1974). Thus, there is no doubt but that *Moore* is still vital law in this circuit.

■ As the *Moore* case makes clear, this court does not have to decide whether or not Sailer was in fact competent at any or all of the crucial moments in the criminal proceedings against him. There is quite possibly room for disagreement, since the psychiatrist minimized the personality disorders which were emphasized by the other observers. This court holds simply that there was a more than sufficient quantum of evidence to alert a trial judge to the possibility that Sailer wasn't competent to stand trial, and to the corresponding necessity to hold a hearing on that issue. The Ninth Circuit has found a much lesser showing to suffice in the federal context of a motion based on 28 U.S.C. § 2255. See Reed v. United States, 391 F.2d 4 (9th Cir. 1968).

■ Failure to hold a competency hearing on the facts of this case deprived Sailer of his right to a fair trial, and is sufficient ground for granting the writ he seeks. See Pate v. Robinson, 383 U.S. 375, 385, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966).

### Voluntariness of the Guilty Plea

■ Due process requires that a trial judge assure himself as best he can that no defendant pleads guilty for reasons other than a well-founded, voluntarily-held belief that he is guilty and that it is to his advantage so to plead. This assurance must be had because a guilty plea is an implicit waiver of virtually all of the protections normally implicit in our criminal justice processes: e. g., the right to confront and examine witnesses; the right to a jury trial; the right not to testify against oneself; the right to appeal. Such rights cannot be lightly abandoned; one must comprehend their meaning and importance before one can intelligently waive their protection. See Boykin v. Alabama, 395 U.S. 238, 243, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

*Boykin* required that the trial court make a record sufficient to show that the defendant was acting voluntarily and with knowledge of the consequences when he entered a guilty plea. It was no longer sufficient for a court to assume voluntariness in the absence of evidence to the contrary.

"What is at stake for an accused facing death or imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence. . . ." 395 U.S. at 243, 244.

■ *Boykin* has been held not retroactive. See Moss v. Craven, 427 F.2d 139 (9th Cir. 1970). This does not, of course, mean that before 1969 due process didn't require that guilty pleas be voluntary and knowing; it means only that *Boykin's* requirement of a complete record on those issues will not be applied across the board to earlier cases. This, in turn, means that any pre-*Boykin* acceptance of a plea will be invalidated only if the entire context of the case indicates a violation of due process; mere

silence of the record will not be sufficient proof of a constitutional violation.[2]

The record in the instant case shows that when Sailer pleaded guilty, the prosecuting attorney asked him a few perfunctory questions about his intentions in pleading and his knowledge of the sentencing process. No attempt was made to probe his volition and understanding in making the plea. This failure alone is possibly not a fatal mistake pre-*Boykin,* but the other circumstances of the case cast it in a more unfavorable light.

As discussed in the section on Sailer's possible lack of competence, *supra,* the trial court had before it as the proceedings progressed a series of evaluations and reports which raised questions about Sailer's mental stability and capabilities. Although none of these were in hand at the time the plea was originally made, most were in the court's possession by the time it ordered Sailer to the county jail in March, 1966, and all were before it when it sentenced him after the alleged escape. On this last occasion, Sailer was finally allowed to make his objection to the plea, which objection had apparently been suppressed by his attorney earlier. See Facts, *supra,* ¶ 13.

For many of the same reasons that it should have held a competency hearing, the trial court at some point in these proceedings should have realized that there were serious questions about Sailer's ability to make a free and knowing plea of guilty. The indications of impulsive and irrational behavior ought to have prompted a more diligent quest for an understanding of the defendant's reasons for his plea. No such effort was made.

■■■ In Schoeller v. Dunbar, 423 F.2d 1183 (9th Cir. 1970), the court found that the evidence before the trial judge didn't necessitate a *sua sponte* hearing on the defendant's competency to stand trial. Judge Hufstedler dissented from that analysis of the facts. She then went on to discuss a different, though related, issue:

> "The standards measuring a defendant's competency to stand trial are not necessarily identical to those defining his competency to enter a plea of guilty. . . . To the extent that they differ, the standards of competency to plead guilty are higher than those of competency to stand trial. A defendant is not competent to plead guilty if mental illness has substantially impaired his ability to make a reasoned choice among the alternatives presented to him and to understand the nature of the consequences of his plea. Because there was strong evidence that appellant fell short of these standards to enter a voluntary and understanding plea, acceptance of the plea was a violation of due process." (Citations omitted.) 423 F.2d at 1194.

This court subscribes to Judge Hufstedler's analysis of the standard to be used in appraising guilty pleas.

■■■ Even if the standards for competency to plead guilty are not higher, given Sailer's attempt to withdraw his plea, and the substantial doubt cast on his competence to make that plea, the court should have allowed the plea to be withdrawn, or at least should have held a hearing on its voluntariness. Failure to do so violated the numerous rights discussed above, and entitles Sailer to the writ he seeks.

*Probation Revocation*

In Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972),

---

2. As a matter of fact, even post-*Boykin* appellate courts have been relying more on the overall record surrounding a guilty plea than on a simple recitation of the *Boykin* rights. Such an articulation is not necessary if the record affirmatively shows that a defendant who pleaded guilty did so knowingly and voluntarily. See Wilkins v. Erickson, 505 F.2d 761 (9th Cir. 1974). This approach is seemingly a move back toward fundamental due process notions and away from talismanic requirements.

the Chief Justice, writing for the Court, made clear just how important parole revocation hearings are to the defendant. Although such hearings are not part of the criminal prosecution process, and therefore do not require that a defendant be accorded the full panoply of rights owing to him during his trial, some kind of fundamental due process is required since personal liberty is at stake. The Court there required: 1) a preliminary hearing before a neutral party as soon as conveniently possible after the parole violation arrest, to establish probable cause for believing that parole was violated; and 2) a later, full-fledged revocation hearing. 408 U. S. at 484–487. Of this second hearing the Court said:

> "This hearing must be the basis for more than determining probable cause; it must lead to a final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation. The parolee must have an opportunity to be heard and to show, if he can, that he did not violate the conditions, or, if he did, that circumstances in mitigation suggest that the violation does not warrant revocation. . . ."

408 U.S. at 488.

*Morrissey* dealt with *parole* revocations, and the petitioner here had his *probation* revoked. For constitutional purposes of due process, however, the Court has said that there is no meaningful difference between the two, and that the same kinds of process must be accorded an individual in each situation. See Gagnon v. Scarpelli, 411 U.S. 778, 781–782 and n. 3, 93 S.Ct. 1756, 36 L. Ed.2d 656. (*Gagnon* differed from the instant case in only one relevant procedural respect: Scarpelli had been sentenced before probation was granted; Sailer wasn't sentenced until after probation was revoked. This court sees no way in which that difference could or should diminish the process due Sailer.)

The Supreme Court has not said whether *Morrissey* will be applied retroactively. Perhaps the question has been answered implicitly, since *Morrissey's* requirements were applied in *Gagnon*, a case in which the crime, the probation revocation, and the application for a writ of habeas corpus all occurred long before *Morrissey* was decided. Thus, *Morrissey's* provisions might be required here *in toto*.

This court need not, however, reach the retroactivity issue, since fundamental due process required far more care in the probation revocation process than was accorded by the trial judge. Such basic rights were required before *Morrissey*, and had to be protected by all courts long before *Morrissey* laid out a particular set of procedures to be followed. *Morrissey* is useful here mostly for its explication of what's at stake in parole/probation revocation, and why basic due process is required.

As far as the record shows, Sailer's rights were not protected in the requisite ways. Although he presumably knew when he came to court in September of 1966 that escape would be charged as a probation violation, he was never asked directly if he had escaped. Probation was revoked before Sailer had said a word, and, when he did speak, it was on his own initiative. There's no indication that he was told of his right to present his own side of things, through witnesses or affidavits. Even if we assume for the moment that he did in fact escape (as seems likely he did), he had a right to explain why, in order to show any reasons for mitigation. He also had a right to have the court consider whether any probation violation which did exist was sufficient to warrant revocation. Admitted violations of probation will in some cases not warrant revocation; the whole situation must be considered so that society's interests are best met by the court's eventual action, be it revocation, continuation of probation as before, or the addition of new probation terms. See *Morrissey, supra,* 408 U.S. at 484, 488, 92 S.Ct. 2593.

To protect both the individual and society's interests, *Morrissey* called for

some kind of "an informal hearing structured to assure that the finding of a parole violation will be based on verified facts and that the exercise of discretion will be informed by an accurate knowledge of the parolee's behavior." 408 U.S. at 484, 92 S.Ct. at 2602. The judge here could have had no such knowledge, since he apparently relied totally on the probation officer's report (dated July 22, 1966), which is obviously based on second-hand information of the kind which *Morrissey* rejected, and which common sense and due process tell us can't be allowed to be the only basis for taking away a person's liberty. This court has rejected such a basis for revocation in Mozingo v. Craven, 341 F. Supp. 296, 300–302 (C.D.Cal.1972), aff'd 475 F.2d 1254 (9th Cir. 1973). See Dennis v. California Adult Authority, 456 F.2d 1240, 1241 (9th Cir. 1972).

Since the trial court made no attempt to obtain even a minimal factual understanding of what Sailer might have done and why, it violated his due process rights, and he is therefore entitled to a writ of habeas corpus.

*Relief*

This opinion shall constitute the findings of fact and conclusions of law required by Rule 52(a) of the Federal Rules of Civil Procedure. On the basis of these findings and conclusions, and pursuant to Rule 58, a judgment shall be entered as follows:

"1. The petitioner is being held in custody by the respondent and the State of California in violation of the Constitution of the United States.

"2. He is entitled to a writ of habeas corpus from this court, and the writ will issue unless the respondent and the State of California shall, within 60 days from the date this judgment becomes final, institute new trial proceedings against the petitioner.

"3. This court retains full jurisdiction of the case to modify, amend, and enforce the judgment."